856 A.2d 1235 (2004)
In re: S.M.B., a Minor,
Appeal of: D.J., Natural Mother, Appellant.
In re: A.M.J., a Minor,
Appeal of: D.J., Natural Mother, Appellant.
In re: G.G.B.,
Appeal of: D.J., Mother, Appellant.
Superior Court of Pennsylvania.
Submitted February 9, 2004.
Filed August 23, 2004.
*1237 John J. Grenko, Reading, for appellant.
Mark R. Sprow, Reading, Guardian Ad Litem, for appellee.
Matthew H. Doll, Reading, for Berks County, appellee.
BEFORE: LALLY-GREEN, BOWES and CAVANAUGH[*], JJ.
OPINION BY BOWES, J.:
¶ 1 Appellant, D.J. ("Mother"), appeals from the order of the Court of Common Pleas of Berks County involuntarily terminating her parental rights to her three children, G.G.B., born May 19, 1994, S.M.B., born June 22, 2000, and A.M.J., born May 4, 2001. On appeal, Mother's counsel argues this appeal is frivolous and seeks to withdraw.
¶ 2 In the present case, we note that appellate counsel has contemporaneously filed a petition for leave to withdraw as counsel as well as an Anders brief. Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). In In re V.E., 417 Pa.Super. 68, 611 A.2d 1267 (1992), this Court extended the Anders principles by applying the rationale underlying Anders to appeals involving the termination of parental rights. Thus, the briefing requirements of Anders are appropriate and applicable in an appeal from an order terminating parental rights.
¶ 3 When considering an Anders brief, this Court may not review the merits of the underlying issues until we address counsel's request to withdraw. In order to comply with Anders and its Pennsylvania progeny, counsel must:
(1) petition the court for leave to withdraw stating that after making a conscientious examination of the record and interviewing the defendant, counsel has determined the appeal would be frivolous;
(2) file a brief referring to anything that might arguably support the appeal, but which does not resemble a "no merit" letter or amicus curiae brief; and
(3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel, proceed pro se or raise any additional points that he deems worthy of the court's attention.
Commonwealth v. Ferguson, 761 A.2d 613, 619 (Pa.Super.2000); see also In Re: Adoption of V.G., 751 A.2d 1174 (Pa.Super.2000) (quoting Commonwealth v. Gee, 394 Pa.Super. 277, 575 A.2d 628, 629 (1990)). After an appellate court receives an Anders brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous. Commonwealth v. Townsend, 693 A.2d 980, 982 (Pa.Super.1997).
¶ 4 The record indicates that on December 16, 2003, appellate counsel filed a petition for leave to withdraw. The petition states that Mother has failed to maintain contact with counsel regarding the viability of the appeal. Counsel represents that he conscientiously and thoroughly reviewed the record and concluded that the appeal would be frivolous. In addition, counsel has filed a brief raising all issues that might possibly support an appeal, has furnished Mother with a copy, and has advised Mother of her appellate rights and her right to retain private counsel or proceed *1238 with the appeal pro se. Based on our review of the record, we conclude that counsel has complied with the requirements set forth in Anders.
¶ 5 We now must determine whether Mother's claim is wholly frivolous. The Anders brief filed by counsel raises three issues, all of which advance the same argument: that the inferences and conclusions of the trial court are not supported by the record and law and cannot provide a basis for terminating parental rights. After a thorough and independent review of the entire record, we do not discern any additional issues for appeal. Accordingly, we address the issues raised in counsel's Anders brief.
¶ 6 Mother contends that Berks County Children and Youth Services ("BCCYS") did not prove by clear and convincing evidence that her parental rights should be terminated and that termination of her parental rights serves the welfare of her three children. Brief for Mother at 4.
¶ 7 We begin by stating our scope and standard of review:
When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. See In re K.C.W., 456 Pa.Super. 1, 689 A.2d 294, 298 (1997). Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Id. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give a jury verdict. See In re Child M., 452 Pa.Super. 230, 681 A.2d 793, 800 (1996). We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence. See In re Matsock, 416 Pa.Super. 520, 611 A.2d 737, 742 (1992).
In Re C.S., 761 A.2d 1197, 1199 (Pa.Super.2000).
¶ 8 BCCYS initially became involved with Mother and her children in 1998, when G.G.B. was three years old, and before S.M.B. and A.M.J. were born. Mother has three other children who are not subjects of the present appeal.[1] In April 1998, BCCYS caseworkers and the police arrived at Mother's apartment searching for a relative of Mother's boyfriend, C.B. The apartment had an odor of marijuana. Three-year-old G.G.B. had been left unattended with four-year-old S.J. in a room with an open, unscreened window. BCCYS met with the family on May 27, 1998, but nothing more was done at that time. N.T., 7/3/03, at 10. BCCYS learned that Mother had given birth on September 11, 1998, to a premature infant, C.F.B., who required a sleep apnea monitor as well as the supervision of an adult trained in cardio-pulmonary resuscitation. The hospital paid for emergency phone services in the residence and provided Mother with the services of visiting nurses. In late September 1998, a visiting nurse noted that Mother had left C.F.B. alone while she walked her older children to school. The record also indicates that Mother had not taken C.F.B. to the pediatrician for his required shots. The situation subsequently was rectified and BCCYS had no further contact with Mother until September 11, 2000. Id. at 10-11.
¶ 9 On that date, Mother asked BCCYS to place her four children in foster care *1239 until she could "get her life in order." Id. at 12. At that time, S.J. was seven years old, G.G.B. was six years old, C.F.B. was two years old, and S.M.B. was three months old. The BCCYS caseworker, Scott Pasquale, noted that the apartment was small, filthy, and cluttered, and it had an overpowering smell. Id. at 13. Two days later, on September 13, 2000, Mother signed a thirty-day voluntary placement agreement and committed to parenting and budgeting classes. Id. at 13. In placement, it was apparent that the children suffered from a myriad of developmental and psychological problems. C.F.B. showed signs of fetal alcohol syndrome and suffered from hyperactivity and sleeping and eating disorders. He did not speak and required constant supervision. G.G.B. had speech problems. Both C.F.B. and S.M.B. had hernias that required immediate medical attention. G.G.B. stated that her father shot needles with white powder into his arms. S.J. stated that there were bugs and rats in the home. Id. at 14-15. On October 7, 2000, Mother sent her sons S.J. and C.F.B. to live with her aunt in Philadelphia and sent her daughters G.G.B. and S.M.B. to live with another aunt. BCCYS closed the case on November 20, 2000. Id. at 15.
¶ 10 In December 2000, BCCYS was notified by the aunt caring for the two boys that Mother had disappeared and her whereabouts were unknown. BCCYS located Mother, and she revealed that she was pregnant with her third daughter, A.M.J. Id. at 16.
¶ 11 In September 2001, Mother, her boyfriend C.B., and her three daughters, G.G.B., S.M.J., and A.M.J., moved into the home of C.B.'s sister ("Mrs.B."). Mother's boys continued to reside in Philadelphia with their great-aunt. Shortly thereafter, Mrs. B. contacted BCCYS and informed the agency of numerous issues including Mother's substance abuse, sexual involvement with Mrs. B.'s paramour, all-night partying and failure to care for her children. Specifically, Mrs. B. noted that G.G.B. had been sent home from school due to severe body odor and that Mother had failed to follow up on medical appointments for C.F.B., who was residing with another aunt. Mary Lou Covington of Covington Counseling, who was involved with the family, expressed concerns about Mother's and C.B.'s drug use and its impact on the children. Id. at 18.
¶ 12 In January 2002, Mother contacted BCCYS, again requesting placement for G.G.B., S.M.B., and A.M.J. Mother indicated that she had no housing and was unable to provide for her children. Id. at 19. Mother eventually found a friend with whom she could reside, but there was no room for the children. Id. BCCYS caseworker, Elizabeth Cadwalader, noted that the children were dirty and smelled and that Mother was annoyed that she had to wait a few days in order for the agency to take the children. Id. at 20. On January 16, 2002, Mother again signed a voluntary placement agreement. Thereafter, the court declared G.G.B., S.M.B., and A.M.J. dependent children and granted BCCYS temporary custody for placement purposes. Id. at 22.
¶ 13 From January 16, 2002, until July 16, 2002, BCCYS offered Mother a plan of services, which included monthly casework sessions, parenting classes, and domestic violence evaluations. Visits with the children were also scheduled for a variety of purposes including special occasions such as G.G.B.'s birthday and medical appointments. Mother's attendance and participation in these sessions was sporadic at best and non-existent at times. Id. at 23-28. At the July 16, 2002 permanency hearing, neither parent appeared, and the goal was changed from reunification to adoption.
*1240 ¶ 14 On July 25, 2002, BCCYS informed Mother that the goal for Mother's children had changed. Id. at 45. Mother indicated that she had received a copy of the court order, and intended to file an appeal of the goal change, but she never did so. Id. at 30. BCCYS provided Mother with a list of support services to aid in Mother's compliance with the goals of the family service plan, including drug and alcohol evaluation, mental health evaluation, parenting classes, and random drug screens; Mother failed to participate in any services. Id. On August 8, 2002, Mother failed to attend the meeting whose sole purpose was to give her the opportunity to explore available services. Id.
¶ 15 Mother was present for the next permanency review hearing. During this period, as well as the third and final review period, Mother resided in New Jersey; the children lived in Berks County. Mother did not visit the children; her last visit was on May 9, 2002. Id. at 43. She failed to participate in any services and made no efforts to contact the children. Id. at 47. BCCYS filed petitions to terminate Mother's parental rights on December 20, 2002. On July 3, 2003, following a hearing, the Honorable P.W. Schmehl of the Berks County Court of Common Pleas terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). The father's rights were terminated with consent, and he is not a party to the present appeal.
¶ 16 The trial court determined that BCCYS met its burden of proof under each section quoted above; however, we need only agree with its decision as to any one subsection in order to affirm the termination of parental rights. In re J.E., 745 A.2d 1250 (Pa.Super.2000); see also In re J.I.R., 808 A.2d 934, 940 n. 6 (Pa.Super.2002). Following our review of the record, we conclude that BCCYS met its burden of proof under 23 Pa.C.S. § 2511(a)(2) which provides as follows:
(a) General Rule. -The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
....
(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
¶ 17 The evidence of Mother's unwillingness and unfitness to exercise parental responsibility within the meaning of § 2511(a)(2) is well-documented in the record. As the trial court noted in its opinion, this family has been involved with BCCYS since 1998. BCCYS has diligently and consistently provided counseling and various other services for Mother during the period preceding termination. Mother was offered basic parenting classes but failed to attend regularly and was discharged for excessive absences. See Trial Court Opinion, 9/2/03, at 6. Also, Mother failed to acknowledge her substance abuse and refused to participate in drug screening. Id. Mother repeatedly has failed to attend to the children's medical needs. Id. at 7. Mother habitually left the children with other caretakers for extended periods and failed to make any regularly scheduled visits. Frequently, her whereabouts were unknown. Id. at 4, 7-9. She failed to maintain any semblance of regular contact with the children by telephone, letters, or visits. Id. at 10. The record is clear that Mother failed to grasp the impact of her repeated absences and "no-shows" on her children. Mother refused to participate in any of the services offered in Berks County *1241 where her children currently reside and testified that she would only participate in services outside of Pennsylvania. Id. at 10.
¶ 18 All three children herein suffer from medical and psychological issues that require the services of professionals capable of treating children with special needs. Mother has refused to accept not only this fact but all of the services offered by BCCYS. Incredulously, Mother contends that through her research on the Internet, she is capable of providing for the special needs associated with developmentally delayed children and does not need additional services. She asserts that her living arrangements in New Jersey are appropriate for young children; however, the property in question is divided into two residences shared by boarders suffering from a variety of mental health issues. Id.
¶ 19 The language of 23 Pa.C.S. § 2511(a)(2) requires that Mother's incapacity or refusal must "have caused the child to be without essential parental care, control or subsistence." As the trial court aptly noted, the three children in the present case have not been adequately cared for by Mother during the entire period that BCCYS has been involved with this family. Mother was aware that in order to retain custody of her children and maintain parental rights, it was necessary to fully comply with the services offered by BCCYS. The services offered by BCCYS were designed to assist Mother with the children's medical needs, improve parenting skills, and address domestic violence and substance abuse issues.
¶ 20 It is axiomatic that essential parental care includes not only a willingness and ability to address the child's nutritional, hygienic, and medical needs but also encompasses the child's emotional well-being. In re J.A.S., 820 A.2d 774 (Pa.Super.2003). G.G.B., S.M.B., and A.M.J. need a stable and nurturing environment where they can receive assistance and services to overcome their developmental delays and achieve permanence in their lives. Mother's refusal to comply with the programs designed to assist her and her children has left the children without proper medical care, a stable home, or a drug-free environment. Additionally, the record clearly and convincingly demonstrates that Mother is unwilling or unable to put herself in a position to provide the necessary care and protection her children need and deserve.
¶ 21 We agree with the learned trial court that "Mother is not in tune with the realities of what is in the best interest of her children." Id. at 11. Nor do we see how Mother's incapacity or refusal will be remedied. Not only has she repeatedly failed to comply with the services offered to her when she did reside in Berks County, presently she simply refuses to return to Berks County, where the children are located, and participate in any services. Trial Court Opinion, 9/2/03, at 10.
¶ 22 We are mindful of the bonds that form between parent and child, and the consequences of breaking those bonds. Indeed, the bond between the children and parents is a proper matter to be evaluated in a termination of parental rights case. In the Matter of the Adoption of C.A.W. and A.A.W., 453 Pa.Super. 277, 683 A.2d 911 (1996). Herein, the record reflects that Mother's concerns for preserving the familial unit are self-serving; the record supports that Mother's primary motivation in contesting the termination of her parental rights is to alleviate her own feelings of guilt rather than mend or strengthen any bonds between Mother and her children. For example, Mother testified that she wanted her children back because "I don't want to feel like I have failed them." Id. at 54. At the same time, Mother failed to participate in any of the services provided *1242 to her by BCCYS that would attempt to alleviate her problems and provide for her children.
¶ 23 Nor do we find any merit in Mother's argument that the trial court failed to consider or accord proper weight to the effect of removal of the children from foster care. To the contrary, as in In re Quick, 384 Pa.Super. 412, 559 A.2d 42 (1989), the trial court herein considered precisely how well these children are adapting in foster care considering Mother's parental inadequacies. After a thoughtful, well-reasoned discussion, in reaching its decision to terminate Mother's parental rights, the trial court opined,
The children, having been in foster care for over one-and-one-half years, are doing rather well considering all of the circumstances, and it is clear to the Court that the developmental, physical, and emotional needs and welfare of the children will be most appropriately served by terminating Mother's parental rights and allowing the children to remain in foster care with the hopes of adoption.
Trial Court Opinion, 9/2/03, at 13 (emphasis added).
¶ 24 Finally, pursuant to 23 Pa.C.S. § 2511(b), the court, in terminating the rights of a parent, shall give primary consideration to the developmental, physical, and emotional needs and welfare of a child. Although Mother has not specifically made her argument in the context of § 2511(b), Mother alludes to it; therefore, we briefly address this section. We agree with the trial court that the present foster care arrangement clearly has been addressing the special needs of Mother's children for the reasons cited supra. We agree with the learned trial court's conclusion that the needs and welfare of the children demand that they be afforded a nurturing environment where their special needs and developmental delays can be addressed and the children can flourish. Therefore, we find that terminating Mother's rights, and allowing the children to be adopted, would be in accordance with § 2511(b).
¶ 25 Finally, we note that we cannot and should not allow Mother's children to be suspended in foster care, languishing until Mother reaches parental maturity. We have repeatedly stated that in a termination proceeding, the focus is on the conduct of the parents. In the Interest of M.B., 449 Pa.Super. 507, 674 A.2d 702 (1996). Accordingly, we find the record and law support the order of the trial court terminating Mother's parental rights.
¶ 26 Order affirmed. Petition of John J. Grenko to withdraw as counsel granted.
NOTES
[*] Judge Cavanaugh did not participate in this decision.
[1] Those three children are S.J., born April 28, 1993, C.F.B., born September 2, 1998, and an infant female, born in 2003.