J-S45014-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: D.N.M., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.M., FATHER, | |
| Appellant | No. 511 EDA 2014 |

Appeal from the Order Entered January 8, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000711-2013, CP-51-DP-0001380-2011,
FID: 51-FN-002998-2011

BEFORE:  BOWES, WECHT, and FITZGERALD,[*] JJ.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 08, 2014**

R.M. ("Father") appeals from the order entered January 8, 2014, wherein the trial court involuntarily terminated his parental rights to then six-year-old D.N.M.[1]  We affirm.

The Philadelphia Department of Human services ("DHS") first became involved with this family on June 14, 2011, after it received a General Protective Services ("GPS") report alleging that D.D. ("Mother") had been involuntarily hospitalized for mental health treatment following a psychotic

---

[*] Former Justice specially assigned to the Superior Court.

[1] The parental rights of Mother and the father of D.N.M.'s younger sibling were also terminated at the same proceeding.  Mother and the other father have filed separate appeals, which are before this panel.

episode. The report, which was later substantiated, further alleged that Mother chronically used drugs, abused PCP, angered easily, screamed and yelled at the children, and hit D.M.N. in a heavy-handed manner. Father was incarcerated, and D.M.N. and her younger sibling were placed in the care of their maternal grandmother.

Mother indicated that she would enter an inpatient drug and alcohol rehabilitation program. The children remained with maternal grandmother and a safety plan was implemented. Mother returned to maternal grandmother's home upon her discharge. DHS learned that the children were not being properly cared for and obtained Orders of Protective Custody ("OPC"). On July 7, 2011, the children were placed with their maternal aunt, K.S. At the July 8, 2011 shelter care hearing, the OPC was lifted and the children's temporary commitment to DHS was ordered to stand. Following a hearing on July 13, 2011, D.M.N. and her sister were adjudicated dependent and placed together with the maternal aunt, where they remained until March 2012, when they were placed in their present pre-adoptive foster home. Mother was referred to for a dual diagnosis evaluation and Father was referred to the Achieving Reunification Center (ARC).

A permanency review hearing was held on October 6, 2011. Although Father had been contacted by DHS social worker Akilah Owens, he did not respond. Father remained incarcerated and did not participate in the January 27, 2012 Family Service Plan ("FSP") meeting. His FSP objective

was to contact DHS so that services could be made available to him. At a subsequent FSP meeting on July 10, 2012, additional objectives of parent training and drug and alcohol treatment were added for Father.

DHS decide to change D.M.N.'s placement goal at the December 28, 2012 FSP meeting. At that point, Mother was not progressing in her meeting her objectives, Father remained incarcerated, and D.M.N. had been in foster care since July 2011. Father was to contact D.N.M. through letters, attend parenting classes and participate in counseling. At the permanency hearing on March 20, 2013, the court listed the matter for a goal change/involuntary termination of parental rights proceeding. During the latter half of 2013, Father responded to DHS correspondence to decline visitation with his daughter in prison as he did not feel it was appropriate. He also expressed that he did not want his daughter to be placed with her sister's father.

On August 14, 2013, DHS informed the court of its intention to seek involuntary termination and a goal change to adoption. On December 20, 2013, DHS filed petitions to that effect, and following a hearing on January 8, 2014, the trial court terminated both Father and Mother's parental rights to D.N.M. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8). Father filed the instant appeal and complied with Pa.R.A.P. 1925(a)(2)(i) by filing a Rule 1925(b) concise statement of errors complained of on appeal. The trial

court addressed the arguments in its Rule 1925(a) opinion. Father presents two questions for our review:

1. Whether the Trial Court erred by terminating the parental rights of Appellant, Father, under 23 Pa.C.S.A. § 2511 subsections (a)(1), (a)(2), (a)(5) and § 2511(a)(8)?

2. Whether the Trial Court erred by finding under 23 Pa.C.S.A. § 2511(b), that termination of Appellant's parental rights best serves the child's developmental, physical and emotional needs and welfare?

Father's brief at 4.

The test for terminating parental rights consists of two parts. In **In re L.M.**, 923 A.2d 505, 511 (Pa.Super. 2007), we explained:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of the best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

"[C]lear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" **In re R.N.J.**, 985 A.2d 273, 276 (Pa.Super. 2009) (quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa.Super. 2003)).

When reviewing an order terminating parental rights,

we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, *supra* at 276 (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa.Super. 2005). "[I]f competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result." *In re N.C.*, 763 A.2d 913, 917 (Pa.Super. 2000). To affirm, we need only find competent evidence in support of any one of the subsections pled. *In re S.M.B.*, 856 A.2d 1235 (Pa.Super. 2004).

Title 23 Pa.C.S. § 2511(a) sets forth the grounds for termination of parental rights and provides in pertinent part:

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonable available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best service the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

23 Pa.C.S. § 2511.

Father's first contention is that DHS did not produce clear and convincing evidence of conduct, sustained for at least six months prior to the filing of the termination petition on December 20, 2013, which revealed a settled intent on Father's part to relinquish his parental claim or a failure to perform parental duties for purposes of section 2511(a)(1). According to Father, the evidence established that he met all of his objectives. He made his whereabouts known to DHS in 2012, and he wrote a letter to the social

- 6 -

worker in 2013. Furthermore, it was undisputed that Father completed parenting and drug and alcohol classes while incarcerated. Finally, Father sent letters to D.N.M., spoke to her on the telephone and sent gifts to her. In light of his compliance with his objectives, Father argues that DHS failed to prove by clear and convincing evidence that his parental rights should be terminated under (a)(1).

DHS counters that, for the first two years when D.N.M. was in placement, Father made no effort to contact her. He effectively abandoned her, grounds for termination pursuant to subsection (a)(1). Father's first contact with D.N.M. and increased contact with the agency occurred two to three months prior to the termination hearing, and coincided with the agency's desire to change D.N.M.'s goal to adoption. According to DHS, Father was not genuinely interested in a parental relationship with D.N.M. or in assuming parental responsibilities. Nor does Father's incarceration excuse performance of parental obligations. DHS maintains that Father remained obligated to utilize available resources "and take affirmative steps to support a parent-child relationship." **In re Adoption of K.J.**, 936 A.2d 1128, 1133 (Pa.Super. 2007). DHS contends that Father did not utilize the available resources to communicate with his child to that end.

Additionally, DHS takes the position that the evidence also satisfied the statutory grounds for termination under (a)(2), since Father had not provided parental care and was not in a position to do so due to his

continuous incarceration. It relies upon ***In re Adoption of S.P.***, 47 A.3d 817, 828 (Pa. 2012), where our High Court held that incarceration is a factor, "and indeed can be a determinative factor" in the termination of parental rights under subsection (a)(2) "where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied."

The record indicates that Father had no contact with D.N.M. for more than two years while she was in foster care. In September 2013, one month after DHS indicated that it would seek a goal change to adoption, Father initiated contact. The timing of his efforts made the trial court "question the sincerity of Father's actions."[2] Trial Court Opinion, 3/11/14, at 6. While he did complete parenting and drug and alcohol classes, Father's "efforts to foster a relationship with his child were belated[.]" Trial Court Opinion, 3/11/14, at 6. It characterized Father's role as "a passive one and akin to that of a pen pal rather than a parent[,]" and found that he "failed to demonstrate a persistent interest in his child's well-being[.]" ***Id***.

---

[2] While the trial court declined to consider any post-petition efforts by Father to remedy conditions described therein pursuant to 23 Pa.C.S. § 2511(b), it properly considered Father's efforts to foster a relationship with his daughter in the months prior to the filing of the goal change/termination petition. However, due to the fact that Father had no contact with D.N.M. for more than two years and only initiated contact upon learning that DHS intended to seek a goal change to adoption, the trial court was not persuaded that the interest in her well-being was genuine.

Furthermore, the court found it was unknown when Father would be able to parent D.N.M. *Id*. In essence, the trial court concluded that Father's incarceration rendered him incapable of parenting and acknowledged that this was a condition that could not be remedied by Father for purposes of 23 Pa.C.S. § 2511(a)(2).

The law is well settled that "[t]he grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re K.J.*, 936 A.2d 1128, 1132 (Pa.Super. 2007). In considering the effect of incarceration for purposes of subsection (2), our High Court stated:

> we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g. Adoption of J.J.*, 515 A.2d at 891 ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); *E.A.P.*, 944 A.2d at 85 (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).

*In re Adoption of S.P.*, *supra* at 830-831.  As this Court has repeatedly noted, "[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill…parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment."  *In re K.J.*, *supra* at 1133 (quoting *In re N.M.B.*, 856 A.2d 847, 856 (Pa.Super. 2004)).

In the instant case, the court found a legal basis for terminating Father's parental rights under 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8).  We find that the record supports termination of Father's parental rights under both subsections (a)(1) and (a)(2).[3]  The record confirms that Father made very limited outreach to DHS until three months before the termination hearing.  Similarly, after no contact with his daughter for more than two years, Father reached out to her at approximately the same time.  The trial court correctly noted that Father's "efforts coincided with [its] decision at the permanency review hearing on August 19, 2013" to schedule a contested goal change hearing, but that he failed to demonstrate a "persistent interest" in D.N.M.'s well-being.  Trial Court Opinion, 3/11/14, at 5.

The trial court was unpersuaded that Father, having failed to maintain a relationship with D.N.M. during his incarceration, could fulfill his role as

_____

[3]  Since we need only find that one statutory ground for involuntary termination of parental rights was established pursuant to subsection (a), we do not reach Father's contentions regarding subsections (5) and (8).

parent upon release from prison. We agree that Father's completion of parenting and drug and alcohol classes cannot compensate for the fact that he has not been present for much of D.N.M.'s life and that he made no effort to contact her for more than two years.

Having concluded that the subsection (a) statutory requirement for involuntary termination of parental rights was established, we must consider whether the record supports the trial court's conclusion that D.N.M.'s needs and welfare will be met by termination pursuant to subsection (b). *See In re D.W.*, 856 A.2d 1231, 1234 (Pa.Super. 2004). Section 2511(b) provides in pertinent part:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

It is well-settled that when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, § 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa.Super. 2010). Instantly, the DHS social worker Akilah Owens, and the foster care social

worker, Zakiah Snead, both testified to the absence of a father-child bond. Ms. Snead represented that, "[D.N.M.] doesn't know her Father other than what I have presented to her in the last couple of months." N.T., 1/8/14, at 89. Ms. Owens agreed that there was no "Child/Father bond" and that termination of Father's parental rights would have no negative effect on D.N.M. *Id*. at 41. The trial court concluded that there was no evidence presented at the hearing of a parent–child bond between Father and D.N.M.

The court also credited the testimony of Ms. Snead that D.N.M. was "very bonded" to her pre-adoptive foster parents with whom she had resided since July 2011. N.T., 1/8/14, at 88. Ms. Owens, who had observed D.N.M. in the home of her foster parents a least twenty-four times concurred in that assessment. *Id*. at 43. The record confirmed that D.N.M. referred to her foster parents as "Mom" and "Dad" and looked to them for nurture. N.T., 1/8/14, at 40, 88. "They care for [D.N.M. and her sister] like they are their own." *Id*. Ms. Snead testified that there would be no negative effects upon D.N.M. if the parental rights of Father were terminated, *id*. at 89, and opined that adoption was the proper goal for D.N.M. *Id*. at 90.

Additional facts in the record support the trial court's finding that termination of Father's parental rights would best satisfy D.N.M.'s developmental, physical, and emotional needs and welfare. Father had not seen his daughter for at least two and one-half years and had no contact at all for at least two years. Father initiated contact only after an impending

goal change to adoption was announced in August 2013, and that contact consisted of one supervised phone call and several letters and gifts. *Id*. at 73-4. We also view the fact that D.N.M. and her younger sister are together in the pre-adoptive foster home as highly beneficial in satisfying the siblings' emotional needs and welfare.

Based upon the foregoing, we find that DHS satisfied its statutory burden pursuant to § 2511(a) and that the termination of Father's parental rights would serve the best interests of D.N.M. under § 2511(b). Accordingly, we affirm the order terminating Father's parental rights as to D.N.M.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/8/2014