J-S54039-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: W.M., a Minor : IN THE SUPERIOR COURT OF
Adjudicated Child : PENNSYLVANIA
:
:
:
:
:
:
:
APPEAL OF: O.M., SR., Natural :
Father : No. 160 WDA 2016

Appeal from the Decree entered January 13, 2016
In the Court of Common Pleas of Erie County
Civil Division at No(s): 90 of 2014

BEFORE: BENDER, P.J.E., OTT and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED FEBRUARY 1, 2017**

O.M., Sr. ("Father"),[1] appeals from the permanency review Order,

which changed the permanency goal for his son, W.M. ("Child") (born in July

2012), to adoption, pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.

Father's counsel, Elizabeth Brew Walbridge, Esquire ("Counsel"), has filed a

Motion for leave to withdraw as counsel and a brief pursuant to ***Anders v.***

***California***, 386 U.S. 738, 744 (1967). We affirm.

On June 3, 2014, the Erie County Office of Children and Youth ("OCY"

or the "Agency") filed a Motion for emergency protective custody and a

shelter care Petition with regard to Child. The trial court entered an Order of

---

[1] Child's mother is not a party to this appeal, as she voluntarily relinquished
her parental rights as to Child.

protective custody on that same date.[2]  OCY filed a dependency Petition on June 4, 2014.  On June 10, 2014, OCY filed a Petition for shelter care, and the trial court entered a shelter care Order.  On that same date, Erie County Court Administration filed a Motion for court-appointed counsel for Child's mother.  OCY filed an agreement for a master's hearing.  On July 1, 2014, the trial court entered an Order adjudicating Child dependent pursuant to 42 Pa.C.S.A. § 6302(1), as Child lacked proper parental care and control, and establishing the permanency goal for Child as return to parent or guardian. On October 2, 2014, the trial court entered a permanency review Order maintaining Child's permanency goal.  The trial court entered a permanency review Orders maintaining Child's permanency goal on February 4, 2015, and again in May 2015.

On June 25, 2015, OCY filed a Motion to return Child to home.  On June 29, 2015, the trial court granted OCY's Motion, and entered an Order directing that Child be returned to home, in the care of Mother.  The trial court further ordered that OCY would retain legal custody, and the matter would remain open for continued monitoring of compliance.  Notably, the Order provided that all other aspects of the May 2015 permanency review Order would remain in effect.  On July 22, 2015, the trial court entered a

---

[2] At the time of Child's placement, Father stipulated to drug use, poor home conditions, failure to following through with medical and dental appointments, lack of supervision and untreated mental health issues.  **See Anders** Brief at 8.

permanency review Order maintaining legal custody with OCY, and physical custody with Mother.

On July 31, 2015, OCY filed a Motion for an emergency protective order and a shelter care Petition. The trial court entered an emergency protective custody Order, and a shelter care Order maintaining legal custody with OCY, and returning physical custody to OCY, with Child to be placed in foster care.

On January 13, 2016, following a hearing, the trial court entered an Order changing Child's permanency goal to adoption. Father filed a timely Notice of appeal. Counsel did not file a concise statement of errors complained of on appeal with the Notice of appeal, *see* Pa.R.A.P. 1925(a)(2)(i), (b), but, rather, indicated her intention to file a motion to withdraw as counsel pursuant to *Anders*, citing Pa.R.A.P. 1925(c)(4).[3]

On appeal, Counsel has filed the Motion for leave to withdraw and an *Anders* brief. The *Anders* brief presents the following claim for our review: "Whether the juvenile court had competent, sufficient evidence to change the goal to adoption under the dictates of the Juvenile Act and the

_____

[3] *See In re J.T.*, 983 A.2d 771, 774 (Pa. Super. 2009) (holding that decision of counsel to follow Pa.R.A.P. 1925(c)(4) procedure in a termination of parental rights case was proper).

corresponding case law[?]" ***Anders*** Brief (amended) at 4.[4]  Father did not

file a *pro se* brief or retain alternate counsel for this appeal.

In ***In re V.E.***, 611 A.2d 1267, 1274-75 (Pa. Super. 1992), this Court

extended the ***Anders*** principles to appeals involving the termination of

parental rights.  Pursuant to ***Anders***, when counsel believes an appeal is

frivolous and wishes to withdraw from representation, he or she must do the

following:

> (1) petition the court for leave to withdraw stating that after making a conscientious examination of the record . . ., counsel has determined the appeal would be frivolous;
>
> (2) file a brief referring to anything that might arguably support the appeal, but which does not resemble a "no-merit" letter or *amicus curiae* brief; and
>
> (3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel, proceed *pro se,* or raise any additional points he deems worthy of the court's attention.

***In re S.M.B.***, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted).

"When considering an ***Anders*** brief, this Court may not review the merits of

the underlying issues until we address counsel's request to withdraw." ***Id.***

In ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009), our

Supreme Court addressed the second requirement of ***Anders***, *i.e.*, the

contents of an ***Anders*** brief, and required that the brief

---

[4] On April 12, 2016, Counsel filed an amended ***Anders*** brief, and, on April 13, 2016, Counsel filed an amended Motion to withdraw as counsel, in compliance with the directives in this Court's Order entered on April 5, 2016.

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous.  Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.  "After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous."  *In re S.M.B.*, 856 A.2d at 1237.

With respect to the third requirement of *Anders*, that counsel inform the defendant/client of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights."  *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Here, Counsel has complied with each of the requirements of *Anders*.  Counsel indicates that she conscientiously examined the record and determined that an appeal would be frivolous.  Further, Counsel's *Anders* brief comports with the requirements set forth by the Supreme Court of Pennsylvania in *Santiago*.  Finally, the record contains a copy of the letter

that Counsel sent to Father, advising him of his right to proceed *pro se* or retain alternate counsel and file additional claims, and stating Counsel's intention to seek permission to withdraw. Accordingly, Counsel now has complied with the procedural requirements for withdrawing from representation, and we will proceed with our own independent review.

In the **Anders** brief, Father claims that the trial court "should not have changed the goal to adoption." **Anders** Brief at 8. In the **Anders** brief, Counsel acknowledges that, "[w]hile [F]ather was 100% compliant with his urine screens, compliant with his mental health appointments, attended his domestic violence classes, there were serious concerns raised with [F]ather's anger, which included biting, verbal abuse, [and] attempted sexual assault." *Id.* at 8-9. Counsel further directs our attention to the testimony of Father's caseworker that "[F]ather has had no compliance with mental health treatment, parenting, and hasn't had visitation. [F]ather's testimony was that [OCY] never gave him an opportunity to be a father." *Id.* at 9.

In its August 17, 2016 Opinion, the trial court set forth the appropriate standard of review, reviewed the evidence of record, and explained its reasoning for changing Child's permanency goal to adoption. **See** Trial Court Opinion, 8/17/16, at 11-14. The trial court's findings are supported by the evidence of record, its legal conclusions are sound, and we discern no abuse of discretion by the trial court in changing Child's permanency goal to

adoption. ***See id.*** Accordingly, we affirm on the basis of the trial court's Opinion with regard to Father's claim. ***See id.***

Our review further discloses no non-frivolous claims that could be raised by Father. On this basis, we grant counsel's Motion for leave to withdraw from representation.

Motion for leave to withdraw granted. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/1/2017

IN THE INTEREST OF      :    IN THE COURT OF COMMON PLEAS
W. M.,                       :    OF ERIE COUNTY, PENNSYLVANIA
A MINOR                 :    JUVENILE DIVISION
ADJUDICATED DEPENDENT    :    DOCKET NO. 90-2014

## 1925(a) OPINION

On January 11, 2016, an order was entered in a dependency case changing the goal to adoption for W.M., the minor child of O█████ M█████, █., (Appellant). Counsel for Appellant filed a notice of appeal and statement of intention to file an *Anders* Brief on February 1, 2016. The record supports the finding the change of goal to adoption was established by clear and convincing evidence and is in the best interest of the child. It is therefore requested the Superior Court affirm the order.

## PROCEDURAL HISTORY AND FACTS

W.M. was born on July 21, 2012 and adjudicated dependent on June 25, 2014. At the time of the adjudication, Appellant stipulated to the facts underlying the cause of W.M.'s removal from the home. Appellant was involved with the Erie County Office of Children and Youth (the Agency) as early as 2005 due to drug use, poor home conditions, failure to follow through with necessary medical and dental appointments for all of his children, lack of supervision, and untreated mental health concerns. *Court Summary, Permanency Review Hearing, January 6, 2016, p.1.*

At the time of the adjudication, Appellant admitted to abusing marijuana and crack cocaine, and also refused to cooperate with the Agency when offered mental health treatment, Early Intervention, and other services. The relationship between Appellant and the child's mother was highlighted by severe domestic violence. Eventually a Protection from Abuse Order was granted for W.M.'s mother.

1

Given the circumstances of the child's adjudication, the Appellant's previous involvement with the Agency, Appellant's refusal to comply with his service plan and otherwise belligerent attitude, his failure to remedy the conditions which led to placement was apparent from the outset. He made clear at the January 29, 2015 review hearing he was not taking his medication, could not control his anger and aggression in the home, had not obtained safe and stable housing for the child, and lacked an overall ability to parent.

At the hearing, the Agency first called Tina Ferraro, a representative and director of the Project First Step program at Erie Homes for Children and Adults. She was involved with the treatment program in place for the Appellant. *Permanency Review Hearing Transcript, 1/29/15, p. 6.*

Ferraro testified she received the referral for the Appellant from the Agency for the "time limited reunification component" of their program. *Permanency Review Hearing Transcript, 1/29/15, p. 8.* Appellant's case was opened on August 4, 2014, and a preliminary plan was crafted to address Appellant's specific abilities, disabilities, and other special needs. *Permanency Review Hearing Transcript, 1/29/15, p. 24, 41.* Ferraro's main focus, initially, was to assist the Appellant with his parenting abilities, including his education, training, and support so he could demonstrate his ability to effectively take care of his children. *Permanency Review Hearing Transcript, 1/29/15, p. 8.* However, because the Appellant would not cooperate with the workers and frequently lashed out at them, a full case plan was never finalized. Ferraro characterized the program and workers efforts as intense, involving assistance from multiple workers from Erie Homes, to work on one deficiency at a time with the Appellant. *Permanency Review Hearing Transcript, 1/29/15, p. 8, 20.*

Ferraro explained multiple personnel were required to work with the Appellant because his anger management issues became a safety concern for the staff. *Permanency Review Hearing Transcript, 1/29/15, p. 8.* After initial interactions with the Appellant, workers felt he was controlling and manipulative. *Permanency Review Hearing Transcript, 1/29/15, p. 13.*

Near the end of Appellant's involvement with Project First Step, Ferraro explained she eventually removed the other workers from the case and dealt with Appellant on her own. Ferraro testified Appellant made comments to the staff members she sent stating "they're women, they're not human, they're not even people..." and continued to blame the workers for one of his paramours leaving him and taking the child with her. *Permanency Review Hearing Transcript, 1/29/15, p. 14.*

Appellant also made derogatory comments to the workers about his children's cognitive and developmental delays. Though it was explained to him the child had cognitive difficulties, and that these difficulties could be rectified once acknowledged, he would angrily say that his "children don't need that. There's no problem here except for my housing. My kids aren't F-ing retards."

Another specific concern addressed with Appellant was appropriate discipline, appropriate play, and how to better interact with the child and his other children. Ferraro stated Appellant's behavior in these instances further evidenced his lack of desire to engage with the children. Instead of using the teaching opportunities to bond with W.M. and his other children, Appellant would make comments like "there's nothing wrong with them, there's nothing wrong with me, the only problem is housing..." Appellant's behavior clearly evidenced his inability to recognize the needs of his children and recognize his own parenting deficiencies. At every turn

3

Appellant played the victim and blamed the problems on the Agency or someone else. *Permanency Review Hearing Transcript, 1/29/15, p. 15-16.*

Despite this, Ferraro spent considerable time attempting to work with the Appellant, explaining that in her experience, an individual exhibiting the same behaviors as the Appellant could not be successful unless they acknowledged their deficits, and attempted to address them one issue at a time. Unfortunately, Ferraro could not convince the Appellant to engage with her even in one-on-one services. Ferraro testified she would try to talk to him. He soon became angry and hung up the phone. He then called back claiming he was somehow disconnected, or otherwise try to manipulate the situation. She stated "one minute he would act as though he wanted you to think he was father of the year…and the next moment" he would play the victim. *Permanency Review Hearing Transcript, 1/29/15, p.16.*

Ferraro stated neither she nor the other workers could ever get to the point of actually addressing proper discipline, budgeting, and conduct in home visits because the Appellant was so resistant to assistance. He refused to interact in any meaningful way with the workers. His only reaction was to argue, play the victim, and blame the state of his housing for his situation. This behavior defined each of approximately thirty meetings when workers attempted to offer services to the Appellant. *Permanency Review Hearing Transcript, 1/29/15, p. 22-23.*

In a last attempt to offer services before discharging Appellant from the program, Ferraro went to Appellant's home with one other worker, making clear to him they would be addressing his issues, and not the issues of either mother of his children. When Appellant answered the door, he stated he was sick. When he tried to talk about his children's mothers, and was redirected, he escalated the conversation and yelled for the workers to leave his home. It was at this point Ferraro testified she told him there was nothing more they could offer him.

4

*Permanency Review Hearing Transcript, 1/29/15, p. 17.* Appellant's case with Ferraro's agency was closed on November 24, 2014, after four months of constant non-cooperation. *Permanency Review Hearing Transcript, 1/29/15, p. 25.*

Further, Appellant failed to take responsibility for the PFA entered against him. Instead, he blamed the Agency and Ferraro's workers. *Permanency Review Hearing Transcript, 1/29/15, p. 17-18.*

On the day of the PFA hearing in December, 2014, Ferraro was present and was escorting the Plaintiff from the courthouse when she realized the Appellant was following her, yelling vulgar words and calling her names. As Ferraro and the Plaintiff continued to walk away, Ferraro looked back and saw Appellant walking down the street after them "kicking the air, throwing papers that were in his hands, [and] yelling other names." When Ferraro finally got to the corner of the street and crossed, she looked back and saw Appellant repeatedly punch a light post or tree and then slam his head repeatedly into a concrete barrier nearby. *Permanency Review Hearing Transcript, 1/29/15, p. 40.*

Ferraro stressed any effort at reunification would be unsafe for the child, given the Appellant's absolute lack of compliance and acknowledgement of his issues. *Permanency Review Hearing Transcript, 1/29/15, p. 18-19*

The Agency next presented testimony from Sharon Slubowski, the ongoing caseworker for the family. Slubowski testified she experienced similar difficulties assisting the Appellant as those of Ferraro and her workers. She testified she could not address any of his children's needs with him because of his behavior. *Permanency Review Hearing Transcript, 1/29/15, p. 45.* Slubowski also expanded on Ferraro's testimony regarding the Appellant's problem with

domestic violence and made clear the Appellant had a PFA against him as to W.M.'s mother. *Permanency Review Hearing Transcript, 1/29/15, p. 51.*

While Appellant attended most of his mental health appointments, Slubowski felt he was not invested in his treatment. Slubowski explained Stairways Behavioral Health prescribed medications for him, but he would not take them consistently, and would subsequently return to the clinic to get different medication after not finishing what was prescribed.

On some days, Appellant would claim to have brain cancer, tumors, seizures, migraines, panic disorder, cardiac arrest, and "leakage." Appellant could not hide these feelings during visitation. At many visits, Appellant came already highly agitated, causing Slubowski to attend to make sure the children were safe. She stated Appellant could not regulate his emotions, or control his anger. *Permanency Review Hearing Transcript, 1/29/15, p. 52-53.*

These concerns were first noted in a report authored by Dr. Von Korff, who performed an evaluation of the Appellant in 2013. *Permanency Review Hearing Transcript, 1/29/15, p. 53-54. See also Court Summary, Permanency Review Hearing, 1/20/15, p. 13.*

According to Von Korff, Appellant lacked the capacity to provide healthy and intimate engagement with his children. He could not differentiate his children from one another and was unable to recognize differences in temperament, interests, and personality. Appellant's failure in this area was not simply due to a lack of expressive verbal skills, but rather a lack of "observational awareness and empathy." The doctor characterized Appellant's emotional and social maladjustment as so profound that his personality was essentially "infantile and narcissistic." It was also the doctor's opinion Appellant could not recognize the signs of "impending explosive rage and employ self-regulatory strategies" so as to minimize risk of harm to his children and others. *Court Summary, Permanency Review Hearing, 1/29/15, p. 13-14.*

6

At several points, Appellant's behavior in the presence of the caseworker escalated so much Appellant had to be escorted by security out of the visits. At one visit, Appellant stated he had a headache and was not feeling well. He wanted to visit outside, stating the room inside the Agency felt like a prison. However, it was fifteen degrees out, and, with W.M., who was still an infant, scheduled to be present at the visit, it was too cold for a baby to be outside. Slubowski relayed this to the Appellant, to which the Appellant responded "Well, if I vomit, I hope my kids don't play in it." Once the children, including W.M. arrived, Appellant began yelling and told the children "Sharon's putting you all up for adoption." At this point, Slubowski asked Appellant to leave, go out to smoke, and calm down, but Appellant refused. At this point, security was called. *Permanency Review Hearing Transcript, 1/29/15, p. 54-55.*

Subsequently, Slubowski attempted to explain the impact his behavior had on his ability to forge a relationship with W.M. and the other children. Instead of accepting this, Appellant continued only to acknowledge his own feelings and what he wanted. He failed to notice W.M. and the other children were crying and upset. When Appellant returned to the room after having been escorted out, he pretended the incident never happened. *Permanency Review Hearing Transcript, 1/29/15, p. 55.*

Next, Slubowski addressed Appellant's compliance with a domestic violence education program and his ability to refrain from acts of violence in the home and community. Though Appellant graduated from the domestic violence program, during the course of the program a PFA was entered against him for three years. He continued to verbally abuse all of his service providers, and was unable to control his anger. *Permanency Review Hearing Transcript, 1/29/15, p. 56-57.*

7

Due to safety concerns, and the active PFA against the Appellant, Slubowski did not visit Appellant's home/ apartment. *Permanency Review Hearing Transcript, 1/29/15, p. 63.*

Appellant's testimony did little to help his position and was not credible. He voiced his compliance with the service plan, completion of the domestic violence course, and a litany of coping skills he learned from that program yet the testimony of both the caseworker and Appellant's service provider, coupled with the entry of the PFA order against him directly contradicts this. *Permanency Review Hearing Transcript, 1/29/15, p. 77.*

Appellant went on to blame alleged actions by the caseworkers to explain why he was "shut off," a good example of his inability to take any responsibility for his behavior and its effect on the child. *Permanency Review Hearing Transcript, 1/29/15, p. 78-79.* He even went so far as to say he felt as though he cooperated with the Agency's service plan requirements. *Permanency Review Hearing Transcript, 1/29/15, p. 83.* Later, he stated his children were taken due to "nothing" he did. *Permanency Review Hearing Transcript, 1/29/15, p. 89.* Appellant stated the only problem he had was with bed bugs in his home and that if he had problems, domestic violence was not one of them. Any of his anger issues were in the past, and Ms. Ferraro's description of his actions in December, 2014 after a PFA was entered were lies. *Permanency Review Hearing Transcript, 1/29/15, p. 90-91.*

At the conclusion of this hearing, it was plain the Appellant lacked the ability to remedy the conditions which led to placement and that the best interests of W.M would not be served with reunification as a goal. Appellant simply had too many problems he refused to address, many of which raised safety issues for the child.

8

No credible evidence of a bond between Appellant and the child was presented. Services to the Appellant were therefore terminated and visitation between the Appellant and W.M. was also discontinued. *Permanency Review Hearing Transcript, 1/29/15, p. 106-109.*

However, the goal was not changed to adoption as to W.M. because the Agency still believed reunification with the child's mother was possible. She was given more time to comply with her treatment plan. A review hearing was scheduled for three months.

A permanency review hearing was held on April 29, 2015. Though present, the Appellant's progress was not applicable, because services and visitation had been terminated after the January 29, 2015 hearing.

The next review hearing was held on July 15, 2015. Appellant was not present. W.M. was returned to his mother effective June 25, 2015, and a review scheduled for six months.

The next permanency review hearing was held on January 6, 2016. The Agency requested the goal be changed to adoption after the mother, who consulted with her attorney, agreed to voluntarily relinquish her rights to W. M. after he once again had been removed from her home. *Permanency Review Hearing Transcript, 1/6/16, p. 5-7.*

The Appellant was also present and demonstrated yet again his inability to remain composed, appreciate and accept the state of his mental health, and take responsibility for himself and his actions.

Appellant's testimony, characterized by interruptions and outbursts, showed he was combative and unable to follow direction. He claimed the Agency told him not to come to the termination proceeding for his other children, professing the workers "looked at [him] evilly," so he left the courthouse and didn't show for the hearing. *Permanency Review Hearing Transcript, 1/6/16, p. 15-16.* He asked the court to give him another opportunity to try again, yet could only

9

point to his "bad feelings" about having a beer on New Years' Eve and the crucifix around his neck to support this. Outside his SSI, he only made two or three hundred dollars per month under the table. *Permanency Review Hearing Transcript, 1/6/16, p.17, 20.*

Appellant refused to give the Agency contact information so they could keep in touch and assist Appellant with his services previously, blaming the PFA against him for why he wanted to keep his information confidential. *Permanency Review Hearing Transcript, 1/6/16, p. 23.*

At the Agency's request, this court took judicial notice of the testimony and submissions at the prior review hearings, including the review hearing in January, 2015 which terminated services to the Appellant and his visitation with W.M. *Permanency Review Hearing Transcript, 1/6/16, p. 8.* This court also took judicial notice of the termination decrees as to Appellant's other children by a different mother. *Permanency Review Hearing Transcript, 1/6/16, p. 9.*

At the close of the hearing, this court determined the testimony of Agency workers was more credible than the Appellant's testimony, and the Agency had met its burden of proving the change in goal was in the best interests of the child by clear and convincing evidence. An order was entered directing the Agency move to adoption and file a termination petition. *Permanency Review Hearing Transcript, 1/6/16, p. 24.*

On February 1, 2016, this court received Appellant's notice of appeal and his counsel's statement of intent to file an *Anders* Brief.

On February 4, 2016, this court filed a letter notifying the Superior Court that in light of counsel's intent to file an *Anders* Brief, no 1925(a) Opinion would be forthcoming.

On March 24, 2016, Appellant's Brief was filed, which included a petition to withdraw as counsel.

On April 11, 2016, counsel for Appellant filed an amended brief and petition to withdraw.

On August 4, 2016, the Superior Court filed an Opinion remanding the case. This court was directed to file a 1925(a) Opinion explaining its reasoning when it changed the goal to adoption at the permanency review hearing of January 6, 2016.

## STANDARD OF REVIEW

When reviewing an appeal from a decree changing a permanency goal, an appellate court accepts the findings of fact and the credibility determinations of the juvenile court if they are supported by the record. *In re R.J.T., 9 A.3d 1179, 1190 (Pa. 2010)*. An abuse of discretion standard is used by the appellate court.

An abuse of discretion is not found if the lower judgment was reasonable, the court applied the law, and the court's action was not a result of partiality, prejudice, bias, or ill will. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the lower court's decision, the decree must stand. *In re A.K., 936 A.2d 528, 533 (Pa. Super. 2007)*. In a change of goal proceeding, the lower court must focus on the child's best interests, and not the interests of the parent. *Id.*

The Agency has the burden of proving the change in goal would be in the child's best interests. *In re M.B., 674 A.2d 702, 704 (Pa. Super. 1996)*.

## DISCUSSION

The Juvenile Act mandates the trial court consider various factors under 42 Pa.C.S.A. §6351(f) when conducting a permanency review hearing. These factors include:

   (1) The continuing necessity for and appropriateness of the placement;
   (2) The appropriateness, feasibility, and extent of compliance with the permanency plan developed for the child

11

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement
(4) The appropriateness and feasibility of the current placement goal for the child
(5) The likely date by which the placement goal for the child might be achieved
(5.1) whether reasonable efforts were made to finalize the permanency plan;
(6) Whether the child is safe;

*42 Pa.C.S.A. §6351(f)*

Additionally, the trial court must also make a determination regarding the child's placement goal pursuant to section (f.1) in one of the scenarios listed including:

(2) if and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian, or custodian is not best suited to the safety, protection, and physical, mental, and moral welfare of the child.

*42 Pa.C.S.A§6351*

At the January 29, 2015 review hearing, which terminated services to the Appellant and also his visitation with W.M., a concise statement was made by this court on the record outlining and addressing many of the statutory mandates. At the January, 2016 proceeding, along with additional testimony, this court took judicial notice of the January 29, 2015 hearing in which visitation with W.M. and services to Appellant were terminated.

Appellant had not changed and made no genuine attempt to use the lessons he should have learned in his programs to address his issues with domestic violence and anger. *Permanency Review Hearing Transcript, 1/29/15, p. 106-107.* During the life of the case, Appellant had one three-year PFA order entered against him to protect W.M.'s mother. That order was entered on December 2, 2014, shortly after Appellant was discharged from Project First Step, and about two months before services to him were terminated.

Appellant's demeanor and testimony throughout showed his inability or unwillingness to take responsibility for his conduct. At every turn he blamed the Agency and other workers for his plight. He cited "evil looks" from the Agency workers as a credible reason he did not appear

12

at his other children's termination hearing and W.M.'s review hearings. Continued placement for the child was therefore necessary to ensure his safety and well-being. Given the testimony at the January 6, 2016 review hearing and the testimony at the prior review hearings, the record shows caseworkers did all they could to secure Appellant's compliance with the service plan and to finalize it, but to no avail. Thus, the inquiry under subsections (f)(1), (2), (3), (5.1), and (6) are satisfied.

In attempting to continue working towards reunification with W.M.'s mother, the goal remained reunification for her alone. Placement therefore remained contingent upon mother's progress, not Appellant's, as all services to him were terminated as of the January 29, 2015 hearing. Later, after W.M. had been returned to the mother and once more removed by Emergency Protective Order dated July 31, 2015, the goal was changed to adoption.

Because the mother was unable to show her ability to care for W.M. and agreed to consent to the adoption of her child, the appropriateness of the goal of reunification for the Appellant was improper *See Permanency Review Hearing Transcript 1/6/16.*

The child is placed with an adoptive resource, is safe, well cared for and thriving in that environment, satisfying the statutory considerations of subsection (f)(6). The caseworker and service providers testified time and time again W.M. was flourishing in the care of the adoptive resource and suffered no adverse effects from separation from Appellant. *Permanency Review Hearing Transcript, 1/6/16, p. 11.*

In its memorandum dated August 4, 2016, the Superior Court directed this court observe the mandate under 42 Pa.C.S.A. §6351(f.1)(2). In directing the Agency to move to adoption and commence with termination proceedings at the January, 2016 hearing, this court satisfied the requirement of subsection (f.1)(2), which directs the court to, among other things, determine "if

13

and when…the county agency will file for termination of parental rights in cases where return to the child's parent…is not best suited to the safety, protection, and physical, mental, and moral welfare of the child." *42 Pa.C.S.A. §6351(f.1)(2)*.

The Agency met its burden of proving the goal change was in the best interests of the child by clear and convincing evidence. There are no issues meriting relief. The order changing the goal to adoption should therefore be affirmed and the termination trial currently scheduled for September 9, 2016 permitted to move forward.

## CONCLUSION

Sufficient reasons were placed on the record to support the determination to change the goal to adoption. Because the statutory requirements governing permanency hearings were met, it is requested the Superior Court affirm the order changing the goal for W.M. to adoption.

Dated this ___ day of August, 2016

By the Court:

_____ J.
Robert A. Sambroak, Jr.

cc:    Kevin Jennings, Esq.
OCY Legal Department

Elizabeth Brew Walbridge, Esq.
4258 West Lake Road
Erie, PA 16505

Catherine A. Allgeier, Esq.
504 State Street, Suite 203
Erie, PA 16501

14