J-S13036-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: D.R., A MINOR | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: F.S., NATURAL MOTHER | : | No. 1408 WDA 2017 |

Appeal from the Order August 28, 2017
in the Court of Common Pleas of Erie County,
Juvenile Division at No(s):  No. 122 of 2016

BEFORE:  GANTMAN, P.J., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    FILED MAY 25, 2018

F.S. ("Mother") appeals from the Order[1] changing the permanency goal for her minor son, D.R. (born in October 2015 – hereinafter, "Child"), from the concurrent goal of reunification/adoption, to adoption alone.  Additionally, Emily M. Merski, Esquire ("Attorney Merski"), Mother's counsel, has filed a Petition for Leave to Withdraw as Counsel and an accompanying brief pursuant to Anders v. California, 386 U.S. 738, 744 (1967).[2]  We grant Attorney Merski's Petition for Leave to Withdraw and affirm the juvenile court's Order.

_____

[1] This Order is final and appealable, for the reasons stated in the juvenile court's Opinion.  See Juvenile Court Opinion, 11/22/17, at 9.

[2] Anders principles "apply in appeals from goal change orders, even in the absence of an involuntary termination decree.  Parents have a right to counsel at every stage of a dependency proceeding."  In re J.D.H., 171 A.3d 903, 906 (Pa. Super. 2017); see also In re V.E., 611 A.2d 1267, 1275 (Pa. Super. 1992).

The juvenile court thoroughly set forth the relevant facts and procedural history underlying this appeal in its Opinion, which we incorporate as though fully set forth herein. See Juvenile Court Opinion, 11/22/17, at 1-8.[3] After Attorney Merski timely initiated the instant appeal, she filed in this Court a Petition for Leave to Withdraw as Counsel and a separate Anders Brief.

Before reviewing the merits of Mother's claims, we must first determine whether Attorney Merski has complied with the dictates of Anders in petitioning to withdraw from representation. See In re X.J., 105 A.3d 1, 3 (Pa. Super. 2014). Pursuant to Anders, when an attorney believes that an appeal is frivolous and wishes to withdraw as counsel, he or she must

> (1) petition the court for leave to withdraw stating that after making a conscientious examination of the record and interviewing the [client], counsel has determined the appeal would be frivolous, (2) file a brief referring to any issues in the record of arguable merit, and (3) furnish a copy of the brief to [the client] and advise [her] of [her] right to retain new counsel or to raise any additional points that [s]he deems worthy of the court's attention.

In re S.M.B., 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted). With respect to the third requirement of Anders, i.e., that counsel inform the client

_____

[3] We note that, attached to the appellate brief filed by Erie County Office of Children and Youth ("OCY"), is a Decree dated December 6, 2017, filed under a separate docket number, wherein the Orphans' Court terminated Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. OCY maintains that Mother did not appeal this Decree. See Brief for OCY at 1. Our decision in the instant appeal does not include a consideration of this Decree. See In re J.F., 27 A.3d 1017, 1024 n.10 (Pa. Super. 2011) (stating that this Court may only consider information contained in the certified record on appeal; anything not contained therein does not exist for appellate purposes).

of her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to [a] petition to withdraw a copy of the letter sent to the[] client advising him or her of their rights." Commonwealth v. Millisock, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, the Pennsylvania Supreme Court has determined that a proper Anders brief must

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

Commonwealth v. Santiago, 978 A.2d 349, 361 (Pa. 2009). Once counsel has satisfied the above requirements, this Court "must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." In re S.M.B., 856 A.2d at 1237.

Here, Attorney Merski has complied with the requirements set forth in Anders by indicating that she made a conscientious review of the record and determined that Mother's appeal would be wholly frivolous. Further, the record contains a copy of the letter that Attorney Merski sent to Mother, informing her of Attorney Merski's intention to withdraw and advising her of her right to proceed pro se, retain counsel, and file additional claims. Finally, Attorney Merski's Anders Brief meets the standards set forth in Santiago. Because Attorney Merski has complied with the procedural requirements for

withdrawing from representation, we will independently review the record to determine whether Mother's appeal is, in fact, wholly frivolous.

Because Mother neither filed a pro se brief, nor retained alternate counsel for this appeal, we will consider the following issue Attorney Merski presents on Mother's behalf in the Anders Brief: "Whether the juvenile court committed an abuse of discretion and/or error of law when it determined that the concurrent permanency goal of reunification/adoption was no longer feasible and changed the goal solely to adoption?" Anders Brief at 2 (capitalization omitted).

Our well-settled standard of review is as follows: "When we review a [juvenile] court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion." In re N.C., 909 A.2d 818, 822 (Pa. Super. 2006); see also In re A.L., 779 A.2d 1172, 1174 (Pa. Super. 2001) (stating that "[t]he standard of review which this Court employs in cases of dependency is broad."). Appellate courts are not in a position to make close calls based on fact-specific determinations, and must defer to the juvenile court judges, who are in the best position to gauge the likelihood of the success of a permanency plan. In the Interest of R.J.T., 9 A.3d, 1179, 1190 (Pa. 2010). "[T]he best interests of the child[,] and not the interests of the parent[,] must guide the [juvenile] court, and the burden is on the child welfare agency involved to prove that a change in goal would be in the child's best interest." In re R.I.S., 36 A.3d at 573, 567 (Pa. 2011); see also In the Matter of S.B., 943 A.2d 973, 978 (Pa. Super. 2008) (stating that the

"[s]afety, permanency, and well-being of the child must take precedence over all other considerations.") (citation and emphasis omitted). A "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." In re J.D.H., 171 A.3d at 908 (citations and brackets omitted).

> Pursuant to 42 Pa.C.S.A. § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, inter alia: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.

Id. (citations and brackets omitted).

Here, Mother contends that the juvenile court abused its discretion in changing the permanency goal for Child from reunification/adoption to adoption, since "the record shows [that Mother], while engaged in court-ordered services, was making progress towards achieving the goal of reunification." Anders Brief at 7.

In its Opinion, the juvenile court cogently addressed Mother's claim and determined that it did not abuse its discretion in changing the permanency goal for Child to adoption, as the evidence showed that it was in Child's best interests. See Juvenile Court Opinion, 11/22/17, at 10-15. We agree with the juvenile court's determination and analysis, which is supported by the record. As the juvenile court's reasoning is sound, and our independent

review of Mother's issue demonstrates that it does not entitle her to relief, we thus affirm based on the juvenile court's Opinion in concluding that the court did not abuse its discretion in changing Child's permanency goal to adoption. See id.

Moreover, our review of the record discloses no other non-frivolous issues that Mother could raise that Attorney Merski overlooked. See In re J.D.H., 171 A.3d at 910. Accordingly, we grant Attorney Merski's Petition to Withdraw, and affirm the juvenile court's Order.

Petition to Withdraw granted; Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/25/2018

IN THE INTEREST OF D.R.　　　　: IN THE COURT OF COMMON PLEAS
A minor.　　　　　　　　　　　　: OF ERIE COUNTY, PENNSYLVANIA
　　　　　　　　　　　　　　　　: JUVENILE DIVISION – DEPENDENCY
　　　　　　　　　　　　　　　　: No. 122-2016

## MEMORANDUM OPINION

This matter is before the Court upon the appeal of F.S. (hereinafter "Appellant"), the Natural Mother of the minor child adjudicated dependent, from this Court's Decree dated August 28, 2017. Appellant is challenging this Court's decision to change the permanency goal to Adoption. For the reasons set forth below, the instant appeal should be dismissed.

## FACTS AND PROCEDURAL HISTORY

D.R. was born on October ' 2015, to Appellant and K.R. On August 8, 2016, the Erie County Office of Children and Youth (hereinafter "OCY") filed a Dependency Petition. Specifically, the Petition alleged D.R. was a Dependent Child pursuant to 42 Pa.C.S.A. §6302 ¶¶1 and 10 under "Dependent child."[1] *Dependency Petition*, August 8, 2016 at 1. In the Petition, OCY alleged that Appellant had an extensive history with OCY. *Id.* at 3. OCY asserted that Appellant's parental rights to three of her children were involuntarily terminated and one other child was removed from her care due to concerns regarding her "cognitive limitations, unstable mental health, domestic violence, unstable housing, inability to meet the children's basic needs and being uncooperative with OCY and service providers." *Id.* Appellant was alleged to be an "indicated perpetrator of abuse wherein one (1) of her other children was the victim." *Id.* In regards to unstable mental health, OCY specifically alleged Appellant "has a

---

[1] ¶1 under 42 Pa.C.S. §6302 defines a "Dependent child" as one who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." Paragraph Ten defines a "Dependent child" as one who "is born to a parent whose parental rights with regard to another child have been involuntarily terminated under 23 Pa.C.S. § 2511(relating to grounds for involuntary termination) within three years immediately preceding the date of birth of the child and conduct of the parent poses a risk to the health, safety or welfare of the child."

1

mental health diagnosis of major depressive disorder and suicidal ideations." *Id.* at 4. The Petition alleged Appellant had an extensive criminal history including convictions for disorderly conduct, terroristic threats, harassment and retail theft. *Id.* Furthermore, the Petition stated Appellant also had three pending criminal charges for disorderly conduct. *Id.* The Petition alleged Appellant had engaged in domestic violence with K.R. in the presence of the child and police involvement was required. *Id.* Additionally, the Petition asserted Appellant "has a history of unstable housing as she has resided in multiple residences including two (2) shelters, various hotels, and with several different individuals." *Id.* Finally, the Petition emphasized Appellant had been "extremely uncooperative with the Agency and service providers" and that she had been "unsuccessfully discharged from multiple programs as a result of non-compliance." *Id.* OCY also advocated for a finding of "aggravated circumstances" based on the definition set out at 42 Pa.C.S. §6302(4) under "Aggravated circumstances."[2] *Id.* at 1. OCY's Petition relied on the fact that Appellant had her parental rights involuntarily terminated to three of their children and K.R. had his parental rights involuntarily terminated to one of his children.

On August 9, 2016, OCY submitted a Shelter Care Application for D.R. The Application alleged D.R., under the care of Appellant, had unstable housing. OCY asserted that Appellant had lived in various residences, to include living with various family members, living in friends' homes, two shelters and various hotels. *Shelter Care Application*, August 9, 2016 at 1. The Application alleged that Appellant had a significant mental health history which included the following diagnoses: Major Depressive Disorder Recurrent Episode Severe; Postpartum Depression; and Borderline Intellectual Functioning. *Id.* Also, OCY alleged Appellant had not been compliant with mental health treatment. *Id.* Appellant has had a history of non-compliance

---

[2] ¶4 under "Aggravated circumstances" in 42 Pa.C.S. §6302 states that aggravated circumstances exist when the "parental rights of the parent have been involuntarily terminated with respect to a child of the parent."

2

demonstrated by her unsuccessful discharge from Family Preservation and Project First Step. *Id.* at 2. Additionally, OCY expressed concern for D.R.'s safety due to the parents' history of domestic violence, including a physical altercation between Appellant and K.R. on July 1, 2016 in the child's presence. *Id.* at 2. Other Agency concerns included Appellant's anger which was on full display when she locked herself in a room and stated to police she would "go out with a bang." Id. The Shelter Application also included Agency concerns with Appellant's cognitive limitations which were buttressed by the fact that "she has an IQ of less than 70." Id.

On August 18, 2016, a Dispositional Hearing was held. At this hearing, the Master recommended D.R. be adjudicated a Dependent Child pursuant to 42 Pa.C.S. §6302. *Master's Recommendation for Adjudication and Disposition*, August 18, 2016 at 1. The Master also asserted there was clear and convincing evidence to find aggravated circumstances existed against Appellant and K.R. *Id.* This Court adopted the Master's Recommendation and D.R. was adjudicated to be a Dependent Child. *Order*, August 23, 2016. Furthermore, the Court found by clear and convincing evidence that aggravated circumstances existed against Appellant under 42 Pa.C.S. §6302 and 42 Pa.C.S. §6341(c.1).[3] *Id.* at 1. The parents consented to the adjudication of dependency and aggravated circumstances. *Master's Recommendation for Adjudication and Disposition*, August 18, 2016 at 1. The Court granted OCY legal and physical custody of the child with placement at foster care, and the placement goal was set as Return to Parent pursuant to 42 Pa.C.S. §6351(f.1)(1).[4] *See Order-Child Dependent*, August 23, 2016.

---

[3] 42 Pa.C.S. §6341(c.1) states: "If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as required in section 6351(e)(3) (relating to disposition of dependent child)."
[4] 42 Pa.C.S. §6351(f.1)(1) states that at a permanency hearing, a court shall determine whether it is in the child's best interest to "be returned to the child's parent."

## A. Permanency Review Hearing on November 9, 2016

Due to the finding of aggravated circumstances and concerns for the child's safety, this Court conducted an expedited 90-day review from the date of adjudication to assess the parents' progress towards Reunification. Based on the testimony and reports provided at this hearing, the Court found that Appellant was in moderate compliance with the permanency plan. The finding that Appellant was "moderately compliant" was somewhat gratuitous and deferential to her. Facts at the hearing revealed that Appellant had participated in a psychiatric evaluation on September 6, 2016 during which she reported symptoms consistent with her diagnosis of bipolar disorder and other episodic psychotic symptoms. *Court Summary*, November 9, 2016 at 8. She also had begun to participate in the Family Engagement Program and was initially compliant and regularly met with her Family Engagement caseworker. *Id.* at 9. However, during the review period, Appellant became oppositional with the Family Engagement caseworker and threatened her with a lawsuit, sent her inappropriate text messages and voicemails, and accused her of inappropriate contact with K.R. *Id.* Consequently, Family Engagement services to Appellant were terminated as a result of this behavior. Appellant agreed, however, to participate in a different parenting program. *Id.* Appellant participated in medical appointments for D.R., but it was unknown whether she understood D.R.'s medical needs due to her cognitive impairment. *Id.* at 10. On September 17, 2016, Appellant's landlord contacted Appellant's OCY caseworker and reported that during a visit to her home, the landlord found Appellant had left her oven door open and all four burners on to heat the apartment. *Id.* The landlord reported the temperature in the apartment was approximately ninety-five degrees, and there was a broken window in the apartment. *Id.* Appellant's apartment was unfurnished, and thus not suitable for D.R. to live in. *Id.*

4

These facts further reinforced concerns regarding Appellant's limited parenting skills, her untreated mental health, her borderline intellectual functioning, her lengthy history with OCY (including involuntary termination of her parental rights for three children). These concerns resulted in this Court's decision to add Adoption as a concurrent goal to Reunification. *See Permanency Review Order*, November 16, 2016 at 1. The addition of the concurrent goal to Adoption was requested by OCY and supported by D.R.'s Guardian Ad Litem. This modification was a clear signal to Appellant that substantial compliance by her was necessary for the best interest of D.R. and to achieve the permanency goal of Return to Parent, or risk termination of her parental rights once again. To further illustrate this Court's efforts to have either parent, particularly Appellant, achieve the goal of Reunification, a six-month review hearing was scheduled to provide Appellant with ample opportunity to demonstrate compliance.

## B.    Permanency Review Hearing on May 1, 2017

After a Permanency Review Hearing on May 1, 2017, the Court found Appellant had only minimally complied with the permanency plan, and had made only minimal progress toward alleviating the circumstances which led to the placement of the child for the reasons set forth below. *Permanency Review Order,* May 3, 2017 at 1. Specifically, this Court found that Appellant was not compliant with her treatment plan. Appellant reported that on November 18, 2016, she had ceased taking her mental health medication as she felt she did not need it. *Court Summary,* May 1, 2017 at 10. Further, Appellant's landlord reported regular domestic incidents between Appellant and K.R. which necessitated police involvement. *Id.* at 13. K.R. had broken two windows and damaged two doors at Appellant's residence. *Id.* The landlord advised Appellant faced eviction unless she paid for repairs. *Id.* Appellant did not attend D.R.'s urology

5

appointment on November 9, 2016 and well-child check on January 19, 2017. *Id.* As Appellant still had not acquired any furniture for the apartment, the residence was not suited for the return of D.R. *Id.* at 14. Also, Appellant had incurred criminal charges for public drunkenness and similar misconduct, as well as for disorderly conduct and obscene language and gestures. *Id.* Finally, Appellant continued to be disruptive and was not cooperative with OCY and others. *Id.* For example, Appellant "lashed out" at OCY staff during a visitation with D.R. on January 6, 2017. *Id.* In another incident, Appellant accused her case aide of striking D.R. and threatened to sue OCY. *Id.*

At the conclusion of this hearing, based on Appellant's non-compliance, both OCY and the Guardian Ad Litem requested that the goal be changed exclusively to Adoption. The Court reluctantly disagreed and, once again, showed deference to Appellant in hopeful optimism that she would demonstrate compliance and achieve the goal of Reunification.

The Court again determined the placement of the child was necessary and appropriate, and on May 3, 2017, ordered that D.R. remain in foster care. *Permanency Review Order*, May 3, 2017 at 2. The Court continued the permanency goal of Return to Parent with the concurrent goal of Adoption. *Permanency Review Order,* May 3, 2017 at 1-2; *Court Summary*, May 1, 2017 at 1. However, noting the lack of progress made in this case, the Court once again expedited a review hearing to occur within ninety days.

### C.    Permanency Review Hearing on August 23, 2017

On August 23, 2017, the Court held another three-month Permanency Review Hearing. This Court, once again, determined Appellant had been only minimally compliant with the permanency plan and had made only minimal progress toward alleviating the circumstances

6

which led to placement. *Permanency Review Order,* August 28, 2017 at 1. The Court was particularly concerned that Appellant was not taking her prescribed mental health medication and was resistant to mental health treatment. On June 14, 2017, Appellant participated in a medication management office visit and was prescribed Latuda, but Appellant did not want to take the medication. *Court Summary,* August 23, 2017 at 10. On August 1, 2017, Appellant stated to her caseworker she did not have a mental health disorder and did not need treatment. *Id* at 11. She further told the caseworker she is only taking the medication to achieve Reunification, but would discontinue the medication once D.R. is returned to her. *Id.* To further demonstrate whether Appellant understood or possessed any self-awareness of her mental health needs, the Court asked her : "[T]ell me what your mental health diagnosis is, mental health." *Permanency Tr.,* August 23, 2017 at 38. Appellant responded: "I don't have no mental health diagnosis." *Id.* This again signaled Appellant's lack of awareness and minimization of her ongoing and serious mental illness, which was left untreated, thereby, compromising her ability to safely care for D.R.

The Court also found that on several occasions, Appellant had delusions D.R. was suffering from serious medical conditions. For example, on May 5, 2017, Appellant scheduled an appointment for D.R. and reported that his "cord" was not attached. *Court Summary,* August 23, 2017 at 13. Appellant demanded the medical staff insert a tube in D.R.'s stomach, which they refused to do. *Id.* On July 18, 2017, Appellant scheduled another medical appointment for D.R. and reported that he appeared pale and was "not looking right." *Id.* Appellant's caseworker canceled this appointment since Appellant had not seen D.R. in several days and D.R.'s foster parents had not reported any issues. *Id.* Appellant became angry and threatened to sue the caseworker for cancelling the appointment. *Id.* The Court also found that Appellant had not

7

acquired any furniture in her apartment besides an inflatable mattress and a computer desk. *Id.* at 15. This series of events also illustrated Appellant's mental illness and, to some extent, her limited ability to safely parent D.R.

Consequently, based on these facts and substantial non-compliance by Appellant, the Court changed the permanent placement goal of Return to Parent with the concurrent goal of Adoption to exclusively Adoption. *Permanency Review Order.* August 28, 2017 at 2. This decision was once again advocated for and supported by both OCY and the Guardian Ad Litem.

On September 26, 2017, Appellant filed a Notice of Appeal from the Permanency Review Order of August 28, 2017, as well as a Statement of Intention to File an *Anders* brief in lieu of a 1925(b) Statement.

## DISCUSSION

Appellant's attorney, Emily, M. Merski, Esquire, filed a "Statement of Intention to File an *Anders* Brief," under Pa.R.A.P. 1925(c)(4). This provision states, in relevant part:

> "In a criminal case, counsel may file of record and serve on the judge a statement of intent to file an *Anders/McClendon* brief in lieu of filing a Statement. If upon review of the *Anders/McClendon* brief, the appellate court believes that there are arguably meritorious issues for review, those issues will not be waived; instead, the appellate court may remand for the filing of a Statement, a supplemental opinion pursuant to Rule 1925(a), or both."

Furthermore, the *Anders* procedure has been engrafted onto parental termination cases. *In the Interest of J.T.,* 983 A.2d 771, 774 (Pa. Super. 2009) (citing *In re V.E. and J.E.,* 611 A.2d 1267, 1275 (Pa.Super. 1992)). In the 1925(c)(4) Statement, Attorney Merski stated that "no non-frivolous appellate issues exist." *Statement of Intention to File an* Anders *Brief,* September 26, 2017 at 1. Assuming, *arguendo,* the Superior Court determines this appeal has merit in spite of the Appellant's Counsel's filing of an *Anders* brief, the appeal should nonetheless be dismissed.

8

The Court finds the current appeal is not interlocutory and therefore is ripe for review. Under Pennsylvania law, "an appeal will lie only from a final order unless otherwise permitted by rule or statute." *Jerry Davis, Inc. v. Nufab Corp.*, 677 A.2d 1256, 1257 (Pa. Super. 1996) (citing *Motheral v. Burkhart*, 583 A.2d 1180, 1183 (Pa. Super. 1990)). The order in this case constitutes a final order as defined by Pa.R.A.P., Rule 341(b), which provides, in relevant part, that a final order is one that "disposes of all claims or parties." In *In re Interest of M.B.*, 565 A.2d 804, 810 (Pa. Super. 1989), the Pennsylvania Superior Court held that a change of goal from Reunification to Adoption was an appealable final order. The Court further stated that to "hold that the juvenile court's approval of the adoption goal is not appealable would frustrate the purposes of the Juvenile Act by preventing review of a trial court decision," and that their holding "fosters the public policies that underlie the Juvenile Act." *In re Interest of M.B.*, 565 A.2d at 810. Here, Appellant is challenging this Court's decision to change D.R.'s placement goal from Return to Parent with the concurrent goal of Adoption to Adoption. As indicated above, this matter is appropriately appealable.

When considering a trial court's determination of a petition for termination of parental rights, an appellate court must apply an abuse of discretion standard. *In re J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). This standard of review requires the appellate court to accept "the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *Id.* In order to conclude that a trial court abused its discretion, the appellate court must determine that the trial court's decision was manifestly unreasonable or was the result of prejudice, bias, ill-will, or partiality. *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006).

9

In matters of custody and placement of a dependent child, the standard to be used by the trial court is the best interests of the child, not those of his or her parents. *Id.* At each review hearing for a child who has been removed from the parental home, a trial court must consider the following, statutorily-mandated factors:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re J.H.*, 788 A.2d 1006, 1008 (Pa. Super. 2001) (citing 42 Pa.C.S.A. §6351(f)).

Applying the above law to the case *sub judice*, the change of goal to Adoption was appropriate and in the best interests of D.R. Throughout the duration of this case, Appellant was only minimally compliant with D.R.'s permanency plan and made little progress in alleviating the circumstances which necessitated his placement. At the Permanency Review Hearing of November 9, 2016, the OCY reported Appellant had been moderately compliant with the permanency plan and had made moderate progress toward alleviating the circumstances which necessitated the placement of the child. *Permanency Review Order*, November 16, 2016 at 1. At the Permanency Review Hearings of May 1, 2017 and August 23, 2017, the OCY reported that Appellant had been only minimally compliant with the permanency plan and made only minimal progress toward alleviating the circumstances which necessitated placement. *Permanency Review Order*, May 3, 2017 at 1; *Permanency Review Order*, August 23, 2017 at 1. Under Pa.C.S. §6351(f), a parent's compliance and progress with a permanency plan is a factor that must be considered by a court at each review hearing. Appellant's lack of compliance and progress indicated to this Court that Appellant was unfit to properly care

10

for D.R. Furthermore, it is not in D.R.'s best interest to live with Appellant because this Court believed D.R.'s health and safety would be jeopardized if the child were permitted to reside with Appellant.

From the beginning of these proceedings, Appellant was placed on notice that the goal change to Adoption was a distinct possibility because, from November 16, 2016 to August 28, 2017, D.R.'s placement goal was established as Return to Parent with the concurrent goal of Adoption. It also should not have been lost on Appellant that having her parental rights terminated for three other children would have given her a heightened awareness of what the consequences of her non-compliance would result in termination of her parental rights. This Court conducted expedited Permanency Review Hearings on November 9, 2016 and August 23, 2017. The purpose of expediting these hearings was to demonstrate concern for the child and a desire for Appellant to improve her circumstances so that Reunification could be achieved. OCY wanted to change the permanency goal to Adoption on May 1, 2017. *Court Summary*, May 1, 2017 at 1. This Court maintained the goal of Return to Parent with the concurrent goal of Adoption to give Appellant the benefit of the doubt and a full opportunity to comply with previous orders to achieve Reunification. *Permanency Review Order*, May 1, 2017 at 1. Despite the opportunities afforded her, Appellant ultimately failed to comply with the permanency plan and failed to make progress in alleviating the circumstances which led to placement. Appellant refused to acknowledge her problems and made no attempt to address the circumstances which led to placement. The Guardian Ad Litem agreed with the decision to change the placement goal to Adoption. *Permanency Tr.*, August 23, 2017 at 8.

11

For this Court, Appellant's refusal to even acknowledge her mental health diagnosis is extremely troubling. At the Permanency Review Hearing on August 23, 2017, upon direct examination by the Court, Appellant explicitly stated: "I don't have no mental health diagnosis." *Permanency Tr.*, August 23, 2017 at 38. The record establishes Appellant has a history of serious mental health issues which persist and prevent her from providing appropriate parental care to D.R. Appellant's mental health diagnoses include: Bipolar Disorder and has reported other Episodic Psychotic Symptoms, Unspecified Schizophrenia Spectrum and other psychotic disorders, specified problems related to psychosocial circumstances, Borderline Intellectual Functioning, and Antisocial Personality Disorder. *Court Summary*, November 9, 2016 at 8. Appellant has also shown an unwillingness to cooperate with mental health treatment. For example, Appellant's caseworker made an unannounced visit to Appellant's apartment on August 17, 2017. *Court Summary Addendum*, August 23, 2017 at 1. The caseworker found that Appellant was taking her mental health medication twice per week, although it was prescribed to be taken daily. *Id.* at 1. As part of the permanency plan, Appellant was ordered to take "all medication as prescribed." *Court Summary*, August 23, 2017 at 10. She also stated to the OCY caseworker that she would only take her medication until D.R. was returned to her and then she would stop taking it. *Id.* Her refusal to acknowledge her condition indicates a lack of understanding and commitment on her part to improve her ability to safely care for D.R.

Appellant's mental illness has manifested itself in numerous ways throughout the duration of this case. At each review hearing, it was established that Appellant exhibited bizarre behaviors, including lashing out at the OCY staff and others for irrational reasons.

12

*Court Summary*, May 1, 2017 at 14. Furthermore, there were several occasions where Appellant falsely believed that D.R. had health issues. *Court Summary*, August 23, 2017 at 13. For example, on May 5, 2017, Appellant scheduled an appointment for D.R. and reported that his "cord" was not attached. *Id.* Appellant demanded the medical staff insert a tube in D.R.'s stomach, which they refused to do. *Id.* On July 18, 2017, Appellant scheduled another medical appointment for D.R. and reported that he appeared pale and was "not looking right." *Id.* Appellant's caseworker canceled this appointment since Appellant had not seen D.R. in several days and D.R.'s foster parents had not reported any issues. *Id.* Appellant became angry and threatened to sue the caseworker for cancelling the appointment. *Id.* Appellant has also been involved in several incidents with K.R. which involved domestic violence requiring police intervention. *Court Summary*, May 1, 2017 at 13. These circumstances clearly indicate that Appellant is unfit to have D.R. in her custody and that D.R.'s health and well-being would be at risk if this were to happen.

Appellant also has shown a pattern of unstable housing throughout these proceedings. She has failed to secure housing that is appropriate for the care of D.R. In fact, at the last Permanency Review Hearing on August 23, 2017, OCY reported that the only furniture in Appellant's apartment was an inflatable mattress and a computer desk. *Court Summary*, August 23, 2017 at 15. The permanency plan directed Appellant to "[o]btain and maintain safe and stable housing." *Id.* at 14. On August 17, 2017, Appellant's caseworker found that Appellant's apartment did not appear to be safe because there were two broken windows with shards exposed. Court Summary. She also had an open window in her second floor apartment which D.R. could easily have fallen

13

out of. Appellant had been mixing Pine Sol, bleach, and dish soap to mop her floors. *Court Summary Addendum*, August 23, 2017 at 1. In fact, the OCY caseworker's feet kept sticking to the floor. This caseworker informed Appellant that it was dangerous to mix these various types of chemicals. Additionally, at the Permanency Review Hearing on August 23, 2017, Appellant's landlord "expressed concern of [Appellant's] apartment and the fact that she had her stove on with the door open and burners on," and the landlord "estimated the apartment to be 95 degrees." *Permanency Tr.*, August 23, 2017 at 5. Appellant clearly demonstrated that she is not willing or capable to provide a safe home for D.R. which is another factor indicating she cannot safely parent D.R.

Finally, Appellant's history with involuntary terminations of parental rights cannot be ignored. Appellant has had her parental rights involuntarily terminated to three of her children and one other child was removed from her care in the past. *Dependency Petition*, August 8, 2016 at 3. On September 19, 2013, Appellant's parental rights to Sl C. J( were terminated due to Appellant's "repeated incapacity, abuse, neglect or refusal" and also her "refusal" to perform parental duties. *Decree*, September 19, 2013 at 1. On the same day, Appellant's parental rights to Sl D( Jr. were terminated for the same reasons. *Decree*, September 19, 2013 at 1. On November 18, 2013, Appellant's parental rights to Sl M( J( were being terminated due to Appellant's "repeated incapacity, abuse, neglect or refusal." *Decree*, November 18, 2013 at 1. These previous involuntary terminations of parental rights justified the finding of "aggravated circumstances" in this case and the necessary heightened scrutiny by this Court attendant with such a finding.

14

For the aforementioned reasons, this Court determined that D.R.'s current placement in foster care was necessary and appropriate at the Permanency Review Hearing on August 23, 2017. *Permanency Review Order,* August 23, 2017 at 1. The history and facts of this case demonstrate that Appellant was given every fair opportunity to demonstrate compliance and achieve Reunification with D.R. Unfortunately, once again, Appellant failed to do so. Furthermore, this Court found that D.R.'s current placement goal of Reunification with the concurrent goal of Adoption was no longer appropriate and feasible, and changed the goal to Adoption. *Id.* at 2. This finding clearly was not an abuse of the Court's discretion. As case law clearly indicates, the abuse of discretion standard is highly deferential to the trial court's determination because the appellate court is required to accept the trial court's findings of fact unless the findings are "manifestly unreasonable." *In re N.C.,* 909 A.2d at 823. As appellate courts have continually recognized, a trial court is in a better position to make the determination as to whether a child should be eligible for adoption, as the trial court is able to evaluate the credibility of the witnesses and resolve any conflicts in the testimony.

Consequently, the best interests of D.R. would be served by Adoption.

15

## CONCLUSION

For the reasons set forth above, the issues raised in F.S.'s appeal are without merit. Therefore, the instant appeal should be dismissed.

BY THE COURT:

Hon. John J. Trucilla, President Judge

cc: Erie County Office of Children and Youth Legal Department
Emily M. Merski, Esq., 3820 Liberty Street, Erie, Pennsylvania 16509
Charles W. Sacco, Esq., 525 West Tenth Street, Erie, Pennsylvania 16502
Alison M. Scarpitti, Esq., 150 East Eighth Street, Erie, Pennsylvania 16502