J-S16044-19
J-S16045-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: E.W.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.L.C., JR., FATHER | : | No. 1866 MDA 2018 |

Appeal from the Decree Entered October 23, 2018
in the Court of Common Pleas of Centre County
Orphans' Court at No(s):  2018-4305

| | | |
|---|---|---|
| IN RE: T.M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.L.C., JR., FATHER | : | No. 1867 MDA 2018 |

Appeal from the Decree Entered October 23, 2018
in the Court of Common Pleas of Centre
Orphans' Court at No(s):  2018-4303

| | | |
|---|---|---|
| IN RE: S.M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.L.C., JR., FATHER | : | No. 1868 MDA 2018 |

Appeal from the Decree Entered October 23, 2018
in the Court of Common Pleas of Centre County
Orphans' Court at No(s):  2018-4304

J-S16044-19
J-S16045-19

| | | |
|---|---|---|
| IN RE: E.W.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.O., MOTHER | : | No. 1909 MDA 2018 |

Appeal from the Decree Entered October 23, 2018
in the Court of Common Pleas of Centre County
Orphans' Court at No(s):  2018-4305 A

| | | |
|---|---|---|
| IN RE: T.M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.O., MOTHER | : | No. 1910 MDA 2018 |

Appeal from the Decree Entered October 23, 2018
in the Court of Common Pleas of Centre County
Orphans' Court at No(s):  2018-4303

| | | |
|---|---|---|
| IN RE: S.M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.O., MOTHER | : | No. 1911 MDA 2018 |

Appeal from the Decree Entered October 23, 2018
in the Court of Common Pleas of Centre County
Orphans' Court at No(s):  2018-4304

BEFORE:  OTT, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED MAY 10, 2019**

- 2 -

In these consolidated appeals, E.O. ("Mother") and G.L.C., Jr. ("Father") appeal from the Decrees entered on October 23, 2018, granting the Petitions filed by Centre County Children and Youth Services ("CYS") seeking to involuntarily terminate their parental rights to their minor female children, T.M.C. (born December 2007) and S.M.C. (born December 2008), and to their minor male child, E.W.C. (born March 2015) (collectively, the "Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]  Additionally, Mother's counsel, Justin Paul Miller, Esquire ("Attorney Miller"), has filed a Petition to Withdraw as counsel and a brief pursuant to **Anders v. California**, 386 U.S. 738, 744 (1967).  We grant Attorney Miller's Petition to Withdraw and affirm the trial court's Decrees.

CYS became involved with the family in 2007, after receiving several referrals citing general parenting concerns.  CYS received additional referrals between 2007 and 2015, when E.W.C. was born, but Mother and Father refused to cooperate with CYS.  In 2015, E.W.C. was born addicted to opiates.  Following E.W.C.'s birth, Mother and Father maintained that they did not wish to cooperate with CYS and refused to receive early childhood intervention services, despite recommendations by CYS and hospital staff.  In 2016, T.M.C.

---

[1] On December 12, 2018, and December 14, 2018, respectively, this Court, *sua sponte*, consolidated Father's and Mother's separate Notices of Appeal as to each of the Children.  We address both consolidated appeals in a single Memorandum for ease of disposition, as the appeals arise out of the same Decrees and the questions raised in each appeal are identical.  We further note that the trial court filed six nearly identical Pa.R.A.P. 1925(a) Opinions, which addressed both parents' appeals.

and S.M.C. were identified as victims of sexual abuse, perpetrated by friends of Mother and Father, prompting CYS to become more involved with the family. CYS recommended, and made available, trauma services for T.M.C. and S.M.C. related to their sexual abuse, but Mother and Father did not facilitate participation, resulting in termination of the services. Moreover, Mother and Father demanded that CYS procure a court order for continued services of any kind. After additional sexual allegations were made against Father, who was registered under Megan's Law, CYS instituted a Safety Plan for the Children. In October of 2016, Mother was arrested for driving under the influence while E.W.C. was in the vehicle. When police arrived at the scene, Mother was incoherent and unresponsive.

On November 18, 2016, following a hearing, the Children were adjudicated dependent based on the unsafe and unsanitary conditions of the family home and the general neglect and mistreatment of the Children. Initially, the Children remained in the home after the dependency hearing. However, in December 2016, a caseworker observed T.M.C. banging her head on the wall while saying "go back, go back" after being discharged from a psychiatric facility that day. When questioned by the caseworker, T.M.C. stated that she wanted to return to the facility because the "big people" at her home were mean. During that timeframe, Mother and Father transferred T.M.C. and S.M.C. from a school that provided individualized education plan ("IEP") services to one without such services, despite knowledge that the services were needed for the growth and development of T.M.C. and S.M.C.

T.M.C. and S.M.C. were often truant, and, when they did attend school, teachers and school officials voiced concerns about their overall hygiene. T.M.C.'s hair was knotted to the point that it was impossible to comb, while S.M.C.'s backpack was covered in cat urine and contained cat feces inside the zipper compartment. Caseworkers observed that the family's house was kept in an unsanitary and unsafe condition and that E.W.C. was often dirty and unsupervised. On February 10, 2017, Father was arrested and jailed on criminal charges related to aggravated indecent assault of a minor. Father was ultimately convicted on the charges and sentenced to 180 ½ to 361 years in prison. Upon Father's detention, Mother would disappear for days at a time, leaving the Children to fend for themselves.

On February 24, 2017, the Children were placed in foster care as a result of CYS's filing for Emergency Protective Custody of the Children. The filing was made after a caseworker observed that the floor of the home was covered in glass, food, broken eggshells and litter; a cat litter box that was overflowing with waste; and E.W.C. was completely unsupervised. Additionally, a neighbor reported that E.W.C. was left naked outside of the home. In the same timeframe, Mother was charged with, and pled guilty to, various offenses, including driving under the influence, with T.M.C. in the vehicle.

At the time of placement, it was noted that E.W.C. had several physical needs that were unmet, including correction of a lazy eye that was causing him to fall. It was also noted that T.M.C. had mental health issues as well as incontinence, defecation problems, bowel impaction, and endocrine problems.

Further, it was noted that S.M.C. had severe mental health issues that made continued placement with her siblings unsafe. At times, S.M.C. would defecate to communicate. S.M.C. also exhibited injurious tendencies, including threatening to kill herself, swallow sharp metal objects, jump out of a moving vehicle, and harm CYS workers. On one occasion, S.M.C. head-butted and kicked a caseworker before proceeding to defecate all over herself. S.M.C. was taken to a hospital, where it was determined that psychiatric institutionalization was medically necessary to prevent harm to herself and others. S.M.C. eventually returned to school but was expelled after threatening her teacher and classmates with scissors. Around the same time, S.M.C. threatened to kill other children in her foster home. Thereafter, S.M.C. was readmitted to a psychiatric facility.

While in the care of their foster parents, T.M.C. joined the cheerleading squad at school, and E.W.C. received proper eye care and became toilet-trained. While the Children were in placement, CYS scheduled visits for Mother with the Children. However, Mother skipped many visits, even those confirmed in advance, and would abscond for weeks at a time, all of which upset the Children. Eventually, CYS and the foster parents would only transport the Children to visit Mother when Mother was already present at the visitation site. When visits did occur, Mother did not interact well with the Children and was often drunk and high on marijuana, suboxone, and opiates. In July 2017, Mother was evicted from her housing in accordance with a protection from abuse order. Mother could not be located throughout the

entire month of July and was unavailable by telephone. CYS nonetheless engaged Family Intervention Crisis Services for reunification purposes. Mother failed to appear for scheduled meetings with CYS and was often under the influence when she did appear. Mother verbally abused and berated numerous caseworkers in front of the Children. Following these outbursts, the Children suffered significant emotional and behavioral setbacks in the progress made since being removed from Mother and Father's care. At one point, Mother's behavior escalated to the point that the Children's Guardian *ad litem* ("GAL") filed a Motion to suspend Mother's visits. After an evidentiary hearing was held, the Motion was granted based on a finding that Mother posed a grave threat to the Children. Mother was thereafter jailed for various outstanding criminal charges, and she did not seek to reinstate visitation privileges.

During this time, Father remained incarcerated. The Children had several non-contact visits with Father, but it was noted that S.M.C. only visited Father once and cried the entire time; E.W.C. was too young to understand the concept of talking into the phone; and T.M.C. wavered in her decision to visit Father. Ultimately, T.M.C. was unable to hold a conversation with Father unless continually prompted by CYS caseworkers. After these visits, T.M.C. and E.W.C. displayed negative moods and behaviors at school and in their foster home. CYS urged Father to attend parenting classes at the jail. However, Father did not complete the classes, claiming that they were unnecessary because he was an adequate parent.

Finding no improvement in the abovementioned circumstances, on March 21, 2018, CYS filed Petitions to involuntarily terminate Mother's and Father's parental rights to the Children. On July 5, 2018, the trial court held an evidentiary hearing on the Petitions (hereinafter, the "termination hearing"). Mother and Father were both present and represented by separate counsel. The Children were not present, but their legal interests were represented by Charles Kroboth, Esquire ("Attorney Kroboth").[2]

---

[2] At the hearing, Attorney Kroboth acknowledged that he was appearing as legal counsel for the Children, and not as their GAL, having previously served as GAL in the dependency proceedings. *See generally In re Adoption of L.B.M.*, 161 A.3d 172, 179-80 (Pa. 2017) (plurality) (requiring the appointment of separate legal counsel, in addition to a GAL in contested involuntary termination proceedings). In *L.B.M.*, a majority of the Court concluded that counsel may serve both as the GAL, representing the child's best interests, and as the child's counsel, representing the child's legal interests, so long as there is no conflict between the child's legal and best interests. *Id.* at 183-93; *see also In re D.L.B.*, 166 A.3d 322, 329 (Pa. Super. 2017) (stating that "separate representation would be required only if the child's best interest and legal interests were somehow in conflict."). Here, E.W.C. was three years old at the time of the hearing, and therefore unable to express his preferred outcome. *See In re T.S.*, 192 A.3d 1030, 1092 (Pa. 2018) (concluding that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests."). Additionally, S.M.C.'s preferred outcome could not be ascertained because, although seemingly able to understand the need for a permanent home, S.M.C.'s mental state was such that she was unable to meaningfully discuss the subject. *See In re Adoption of D.M.C.*, 192 A.3d 1207, 1212 n.10 (Pa. Super. 2018) (stating that a "legal-interest attorney, separate from a best-interest attorney, need not be appointed for a child who is unable to articulate a position to legal counsel because, in that situation, there is no conflict between the child's legal and best interests."). Finally, T.M.C.'s preferred outcome, *i.e.*, that she be adopted, did not conflict with her best interests. Accordingly, we conclude that there is no conflict between the Children's legal interests and best interests, and the dictates of *L.B.M.* are satisfied.

By Decrees entered on October 23, 2018, the trial court granted CYS's

Petitions and involuntarily terminated Mother's and Father's parental rights to

the Children. Thereafter, Mother and Father filed timely, individual Notices of

Appeal and Concise Statements, pursuant to Pa.R.A.P. 1925(a)(2)(i), and (b).

Attorney Miller then filed a Petition to Withdraw as counsel and an

accompanying **Anders** Brief. Mother did not file a *pro se* brief or retain

alternate counsel for this appeal.

Mother and Father raise identical questions on appeal:

> I.    Did the trial court commit an error of law and/or abuse of
> discretion in concluding that clear and convincing evidence
> was presented to justify involuntary termination of
> [Mother's and Father's] parental rights pursuant to either
> 23 Pa.C.S.A. [§] 2511(a)(2)[,] (5)[,] or (8)[?]

**Anders** Brief at 6; Father's Brief at 9 (footnote omitted).[3]

> Before reaching the merits of [an] appeal, we must first
> address the propriety of counsel's petition to withdraw and
> **Anders** brief. The **Anders** procedure, whereby [] counsel may
> withdraw if he or she concludes that an appeal is wholly frivolous,
> initially applied to direct appeals in criminal matters….

**In re J.D.H.**, 171 A.3d 903, 905 (Pa. Super. 2017). The **Anders** principles

have been extended to a first appeal by an indigent parent from a decree

involuntarily terminating his or her parental rights. **See In re V.E.**, 611 A.2d

1267, 1275 (Pa. Super. 1992).

To withdraw from representation, counsel must

---

[3] Neither Mother nor Father addressed 23 Pa.C.S.A. § 2511(b) in their briefs, which could result in waiver of the issue. Nonetheless, we will address the matter of the Children's best interests as part of our review.

> (1)   petition the court for leave to withdraw stating that after making a conscientious examination of the record ... counsel has determined the appeal would be frivolous;
>
> (2)   file a brief referring to anything that might arguably support the appeal ... ; and
>
> (3)   furnish a copy of the brief to [the client] and advise him of his right to retain new counsel, proceed *pro se,* or raise any additional points he deems worthy of the court's attention.

*In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted).

We further review an *Anders* brief for compliance with the requirements set forth in *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009):

> In the *Anders* brief that accompanies [] counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* at 361. "After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d at 1237.

Our review confirms that Attorney Miller complied with each of the requirements of *Anders* and *Santiago*. Attorney Miller asserts that he made a conscientious review of the record and determined that Mother's appeal would be wholly frivolous. Attached to Attorney Miller's Petition to Withdraw is a copy of the letter sent to Mother, dated January 22, 2019, containing the

- 10 -

requisite advisements and enclosing a copy of the **Anders** Brief. Having concluded that Attorney Miller satisfied the procedural requirements for withdrawing from representation, we next examine the record and make an independent determination of whether Mother's appeal is, in fact, wholly frivolous. Because the question raised in Mother's appeal is identical to that in Father's appeal, we will address the merits of each simultaneously.

In the **Anders** Brief, Attorney Miller questioned whether CYS presented sufficient evidence to support the involuntary termination of Mother's rights under 23 Pa.C.S.A. § 2511(a). **Anders** Brief at 6. Specifically, Mother claims that her parental rights should not be terminated because she is trying to "better herself" in order to alleviate the problems that led to the Children's placement, is working towards obtaining a GED, and achieved sobriety while in jail. **Id.** at 19-21.

Father likewise challenges the sufficiency of the evidence to support the involuntary termination of his rights under 23 Pa.C.S.A. § 2511(a). Father's Brief at 9. In particular, Father claims that his parental rights should not have been terminated because the Children were not removed from the home while he resided there, which he poses as evidence that the conditions leading to placement would be remedied through his presence at the home. Father further emphasizes his insistence to secure visits with the Children despite being incarcerated. **Id.** at 18-19. Father also asserts that the trial court erred by considering the length of his sentence in its decision to terminate his

parental rights, as he has not yet exhausted his direct appeal rights.

*Id.* at 19.

In reviewing an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed … only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Thus, we will confine our review to the termination of Mother's and Father's parental rights pursuant to subsections 2511(a)(2) and 2511(b). Section 2511 directs the Court to engage in a bifurcated process:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 924 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 12 -

Pursuant to subsection (a)(2), parental rights may be terminated, after the filing of a petition, when

> [t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). If the court finds subsection (a)(2) is satisfied, it must then consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the child's best interest. *Id.* § 2511(b). "The emotional needs and welfare of the child have been [] interpreted to include [i]ntangibles such as love, comfort, security, and stability. … The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

We further note that

> incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control or subsistence[,] and the length of the remaining confinement can be considered as highly relevant to whether the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent, sufficient to provide grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2). … If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

- 13 -

***In re Adoption of S.P.***, 47 A.3d at 830–31 (citations and quotation marks omitted).

Here, the trial court determined that clear and convincing evidence existed to support the involuntary termination of Mother's and Father's parental rights to the Children under subsection (a)(2). Specifically, the trial court determined that Mother and Father repeatedly and continually deprived the Children of essential parental care, control or subsistence necessary for the Children's physical or mental well-being, and that the conditions and causes of such deprivation could not or would not be remedied:

> The evidence demonstrated that Mother was wholly neglecting T.M.C.'s emotional, physical, and overall needs even before T.M.C. was declared dependent and before her removal from the home…. In that regard[,] Mother failed to follow through with much-needed trauma services for T.M.C. to help her in coping with the sexual abuse she suffered at the hands of Mother['s] and Father's friends who had lived in the family home. Mother, [] along with Father[,] had moved T.M.C. from a school where [an] IEP was provided to her to a school without IEP services, despite knowing that T.M.C. needed the services. T.M.C. was truant from school, and when she did attend school, there were concerns about her hygiene. Mother was at times unable to be found altogether, and the home was found to be unsanitary and unsafe during CYS visits. In this same timeframe, Mother was arrested and charged with various crimes in relation to driving under the influence of prescription medications with T.M.C. and E.W.C. in the car. Following placement [of the Children,] Mother's conduct and her neglect of the Children, including T.M.C., worsened. When Mother would appear for visits [(having skipped many)] at CYS, she would arrive unprepared, and she was not able to keep the Children's attention or direct them. … She could not be located at all for much of July. She did not attend any scheduled visits with T.M.C. in June, July, August, or September of 2017. Mother was untruthful with [CYS] at times, and failed to follow through with any [CYS] recommendations or directives. She expressed a desire

to have the Children returned to her, but she refused to cooperate with reunification services, and she failed to otherwise take steps to make needed changes to ensure the safety and well-being of [the] Children.

…

The evidence demonstrated that Mother was wholly neglecting S.M.C.'s emotional, physical, and overall needs even before S.M.C. was declared dependent and before her removal from the home…. In that regard[,] Mother failed to follow through with much-needed trauma services for S.M.C. to help her in coping with the sexual abuse she suffered at the hands of Mother['s] and Father's friends who had lived in the family home. Mother, [] along with Father[,] had moved S.M.C. from a school where [an] IEP was provided to her to a school without IEP services, despite knowing that S.M.C. needed the services. S.M.C. was truant from school, and when she did attend school, there were concerns about her hygiene. Mother was at times unable to be found altogether, and the home was found to be unsanitary and unsafe during CYS visits. In this same timeframe, Mother was arrested and charged with various crimes in relation to driving under the influence of prescription medications with T.M.C. and E.W.C in the car. Following placement [of the Children,] Mother's conduct and her neglect of the Children, including S.M.C., worsened. When Mother would appear for visits [(having skipped many)] at CYS, she would arrive unprepared, and she was not able to keep the Children's attention or direct them. … She could not be located at all for much of July. She did not attend any scheduled visits with S.M.C. in June, July, August, or September of 2017. Mother was untruthful with [CYS] at times, and failed to follow through with any [CYS] recommendations or directives. She expressed a desire to have the Children returned to her, but she refused to cooperate with reunification services, and she failed to otherwise take steps to make needed changes to ensure the safety and well-being of [the] Children. … During much of this time, Father was also unavailable to S.M.C. due to his incarceration while awaiting trial for serious criminal charges, a fact known to Mother. Furthermore, the evidence demonstrated that S.M.C. had significant special needs, both [*sic*] physically, psychologically, and emotionally. In addition to failing to take any steps whatsoever to assist S.M.C. in addressing those needs, Mother was aggravating the situation by virtue of her refusal to participate in reunification efforts, her sporadic, inconsistent, visits with

- 15 -

S.M.C. and her inappropriate behavior on the rare occasions she did.

…

The evidence demonstrated that Mother was wholly neglecting E.W.C.'s overall needs, as well as the needs of her other two children, even before E.W.C. was declared dependent and before his removal from the home…. E.W.C. had been born addicted to pain medications, exhibiting signs of withdrawal at birth. Mother and Father failed to assure that E.W.C. received early childhood intervention services despite having been advised that he needed them. Mother was arrested, and later convicted, for driving under the influence of controlled substances with E.W.C. in the vehicle. Mother was at times unable to be found altogether, and the home was found to be unsanitary and unsafe for E.W.C. during CYS visits. Following placement [of the Children,] Mother's conduct and her neglect of the Children, including E.W.C., worsened. When Mother would appear for visits [(having skipped many)] at CYS, she would arrive unprepared, and she was not able to keep the Children's attention or direct them. … She could not be located at all for much of July. She did not attend any scheduled visits with E.W.C. in June, July, August, or September of 2017. Mother was untruthful with [CYS] at times, and failed to follow through with any [CYS] recommendations or directives. Trial Court Opinion Mother, 12/20/18, at 17-19.

[As to Father, CYS] presented clear and convincing evidence that Father's repeated and continued incapacity, neglect and refusal has caused [the Children] to be without essential parental care, control or subsistence necessary for her physical and mental well-being, and further, that the conditions and causes of that incapacity, neglect and refusal cannot or will not be remedied by Father.

…

As [CYS] points out, even before Father's most recent conviction and lengthy prison sentence, Father failed to take very basic steps that had been identified by [CYS] as necessary to assure the physical safety and emotional well-being of the Children, and Father, like Mother, was largely uncooperative with [CYS] and hostile to the caseworkers who attempted to assist the family. Father refused to acknowledge the significant drug and alcohol problems that prevented Mother from safely caring for the Children, leaving the Children vulnerable in Mother's care. Even when Mother herself admitted to conduct such as driving with

- 16 -

E.W.C. while under the influence, … Father continued to deny that Mother had done so. Father was demonstrated to be combative with [CYS] workers at times before the Children were placed in care and uncooperative in terms of providing releases to permit [CYS] to ensure that the Children and parents were receiving required services. Father did not have the sexual offender's assessment that was required after the allegations of his most recent sexual abuse of a minor came about, and before he was criminally charged for that conduct.

…

[Father] did not follow through to make sure T.M.C. [or] S.M.C. received the trauma therapy [] desperately needed to cope with the sexual abuse [] experienced at the hands of family friends who lived in [the] home. Both [T.M.C. and S.M.C.] were often truant from school, and when they did attend, there were serious hygiene concerns. S.M.C. clearly has significant mental health problems that were not identified, let alone addressed, while in Mother and Father's care. E.W.C. was not receiving needed early intervention services.

…

Despite the Children being adjudicated dependent, and [CYS] identifying those things the parents needed to address for the safety and well-being of the Children, Father did not take steps to address these issues, thus demonstrating a refusal or inability to provide the basic care [the] Children fundamentally needed. … He refused to participate in [CYS's] efforts to provide support in that regard. He continued to deny responsibility for the lack of follow[-]through with services for the Children.

…

Although Father is correct that the fact of incarceration, alone, is an insufficient reason to terminate parental rights, that does not mean a court should ignore a parent's inmate status in analyzing allegations of parental incapacity. To the contrary, the Pennsylvania Supreme Court has clarified that incarceration is a factor to be considered…. Given Father's sentence of 180[]½ to 360 years in state prison, it seems fairly evident that Father cannot remedy the incapacity and neglect that lead to the Children being adjudicated dependent even if he were to have a change of heart regarding his role in the underlying condition leading to dependency and placement. Trial Court Opinion Father, 12/12/18, at 17-19.

- 17 -

In addition, the trial court determined that termination of Mother's and Father's parental rights is in the Children's best interests, pursuant to subsection 2511(b):

> Although [there was] some evidence of a once[-]existing natural bond between T.M.C. and Mother, the clear and convincing evidence showed a significant deterioration of that bond had occurred. … [As to S.M.C., the c]ourt did not find evidence of an existing bond between Mother and S.M.C. … The evidence overwhelmingly established that termination of Mother's parental rights would not destroy an existing relationship that is necessary or beneficial for [T.M.C. or S.M.C.]
>
> …
>
> [With regard to E.W.C.,] [t]he clear and convincing evidence established that E.W.C. has bonded with his foster parents and thrived while in their home. It appears doubtful that E.W.C. understands that the foster parents are not his natural parents. The [c]ourt did not find evidence of an existing bond between Mother and E.W.C. Moreover, as with the other children, the [c]ourt concluded that the evidence overwhelmingly established that termination of Mother's parental rights as to E.W.C. would not destroy an existing relationship that is beneficial or necessary his well-being and overall welfare.
>
> …
>
> To the contrary, evidence established that visits with Mother while reunification efforts were underway resulted in setbacks from the significant progress [T.M.C. and S.M.C.] had made after being removed from her parents' care [and] resulted in emotional outbursts and setbacks for E.W.C.
>
> …
>
> [T]he [c]ourt accepted credible testimony by S.M.C.'s most recent caseworker that S.M.C. needs a stable[,] loving family, as well as [CYS] testimony that S.M.C. needs a consistent, structured environment. Mother has not provided stability, structure or consistency for S.M.C., nor has she undertaken any effort to do so since S.M.C.'s placement. Trial Court Opinion Mother, 12/20/18, at 19.
>
> Although there was evidence that T.M.C. still cared for [] Father, the evidence overwhelmingly established that there was no beneficial bond between them. [As to S.M.C., the court found

no evidence] of a bond existing between Father and S.M.C., let alone a bond that was beneficial to S.M.C.

…

[With regard to E.W.C.,] [t]he clear and convincing evidence established that E.W.C. has bonded with his foster parents and thrived while in their home. It appears doubtful that E.W.C. understands that the foster parents are not his natural parents. There was no evidence to establish an existing bond with [] Father.

…

Visits with [] Father while reunification efforts were underway resulted in setbacks from the significant progress [] made.

…

[T]he [c]ourt accepted credible testimony by S.M.C.'s most recent caseworker that S.M.C. needs a stable[,] loving family, as well as [CYS] testimony that S.M.C. needs a consistent, structured environment. Father did not provide stability, structure, or consistency for S.M.C. before he was incarcerated, and certainly will not be able to provide this for her while he serves out his lengthy prison sentence. … [T]he conditions leading to placement [were the same as those leading to dependency and] continued to exist [before Father was incarcerated] and Father had done nothing to remedy the conditions. Trial Court Opinion Father, 12/12/18, at 18-19.

***

[Moreover,] the evidence showed that T.M.C. was doing very well in her foster home. She lives with her brother, E.W.C., and has bonded with her foster parents. T.M.C. [is] enrolled in a school with an IEP. She [is] engaging in extracurricular activities such as cheerleading and gymnastics, and learning [to have] confidence in herself. Her emotional needs [are] being addressed through consistent trauma therapy, and her medical needs [are] also being addressed. There was much improvement with the incontinence and defecation issues she had been experiencing. As to the bond [between T.M.C. and her] foster parents, testimony established that T.M.C. had developed a loving bond with her foster parents, and that she relied on them for her physical and emotional needs, as well as her day to day needs for her general

welfare and well-being. She expressed wanting to be adopted into the foster family.

…

Although S.M.C.'s mental health disorders have made sustainable progress difficult, the evidence established that she has made progress since removal from Mother and Father's home. She is currently receiving medical and counseling services she needs, both of which were lacking [previously].

…

[As to E.W.C.,] the foster parents have made sure that E.W.C. has the early intervention services he needed, and they have taken him for medical appointments. He was prescribed eyeglasses to remedy the lazy eye condition that was interfering with his walking and stability. Evidence established that he is safe and secure in the foster parents' home, presently with T.M.C. as well, and that they have created a loving, stable environment for him and consistently attended to all of his needs. Trial Court Opinion, 12/20/18, at 18; Trial Court Opinion, 12/12/18, at 18.

Upon review, we conclude that the trial court's decision to terminate Mother's and Father's parental rights under subsections 2511(a)(2) and (b) is supported by competent, clear and convincing evidence in the record. Although Father and Mother claim that they love the Children, *see* N.T., 7/5/18, at 203, 214-15, 218, this Court has held that a parent's love for a child, alone, does not preclude termination of parental rights. *See In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007). It is well-settled that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008).

We discern no abuse of the trial court's discretion in concluding that the Children's needs were being irreparably neglected and that their best interests

are served through the underlying termination of parental rights. Further, because our independent examination of the record indicates that there are no other non-frivolous claims that can be raised by Mother, we conclude that Mother's appeal is frivolous, and grant Attorney Miller permission to withdraw as counsel. Based upon the foregoing, we affirm the trial court's termination of Mother's and Father's parental rights to the Children pursuant to subsections 2511(a) and (b).

Petition to Withdraw granted. Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/10/2019